**WHITMAN et al. v. UNITED STATES.**
No. 48725.

United States Court of Claims.
March 3, 1953.

Horace S. Whitman, Washington, D. C., for plaintiff.

John B. Miller, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., Gaines V. Palmes, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This is an action for an increase in fixed fee in the amount of $126,216.60, under a cost-plus-a-fixed-fee contract. By order of the court dated October 11, 1948, the proceedings in this case were, on defendant's motion pursuant to old Rule 39(b), limited to the preliminary question of the validity of certain releases furnished by plaintiffs to defendant.

It is plaintiffs' position that the releases are invalid, and that even if valid, they do not bar the claim here asserted. Defendant contends that the releases are valid, and that they preclude recovery of any increase in plaintiffs' fixed fee.

On August 6, 1940, plaintiffs and defendant entered into a contract whereby defendant engaged the services of plaintiffs as Architect-Engineer in the construction of a large Chemical Warfare Service project at Edgewood, Maryland. The contract provided that plaintiffs would receive as compensation for their services a fixed fee of $60,400. This amount was based on defendant's estimate of cost of the project as $5,559,273, with an estimated completion time as provided for in the contract of 10 months.

This contract was the second one covering work of the nature here involved awarded by the Army, and it was plaintiffs' initial contract of the kind. The information furnished plaintiffs prior to the signing of the contract was insufficient for plaintiffs to formulate an estimate of their own as to the probable cost and completion time of the work, and indicated that the work to be performed was novel and complicated. Plaintiffs relied on defendant's estimate of the cost of and time for the project as being as reasonably accurate and determinative of the scope of the work as could be made at the then existing stage of the plans. Actually, however, defendant at that time had insufficient information to enable it to determine the amount or extent of the work required under the contract.

Within a month after the execution of the contract, plaintiffs realized that the cost of the work to be done would exceed defendant's original estimate of cost. In November 1940, three months after the signing of the contract, an estimate by defendant placed the cost at $11,740,000. Later information available to plaintiffs indicated that even this estimate was too low, and on February 24, 1941, defendant made a new estimate of the cost of the project in an amount exceeding $19,000,000. Both prior to and after the defendant's estimate of February 24, 1941, plaintiffs made several attempts in writing to secure an increase in their fixed fee. These are summarized in findings 6 and 7. Defendant made no re-

sponse in writing to these and other requests by plaintiffs for an increase in fee.

During the course of the contract work, increases in the scope of the work were ordered by defendant, although these were never formally characterized as changes in the scope of the work. While the contract work was under way, defendant added other work by change orders, the estimated cost of which was $6,636,437, and the actual cost of which exceeded $9,000,000. Plaintiffs have been paid additional compensation for the change order work, and it is not involved in this suit.

The extent of the change in the scope of the work not covered by change orders could not have been fully and accurately determined prior to the completion of the contract.[1] Although defendant made no response in writing to plaintiffs' written requests for an increase in their fixed fee, defendant's officers orally urged plaintiffs to proceed with the contract work and to postpone determination of the exact scope of the work and the consideration of additional compensation until the conclusion of the contract. Except for the requests for readjustment previously referred to, plaintiffs acceded to these promptings and completed the project.

Work under the original contract, exclusive of change order work, was substantially completed in June 1942. It had extended over a period of 22 months, and had cost in excess of $17,000,000. The work covered by change orders was completed on March 6, 1943. The total cost of the project was approximately $26,500,000.

In the early summer of 1941, plaintiffs were asked by defendant to make an inspection of sites for another project similar to the one under way at Edgewood. Following plaintiffs' recommendation of Huntsville, Alabama, this site was selected by defendant as the location of the new project, and plaintiffs were advised that they had been selected as Architect-Engineer of the Huntsville work. Plaintiffs promptly began preparations to move some of their men from Edgewood to Huntsville, and to recruit other personnel.

Subsequently, on July 8, 1941, plaintiffs were advised for the first time that they could not obtain the Huntsville contract unless and until a release of claims for an increase in fixed fee on the Edgewood contract was executed. On July 10, 1941, plaintiffs executed and delivered to defendant the required release, which is quoted in finding 13. At the time this release was entered into, the only claim which plaintiffs had arising out of the Edgewood contract was the claim for increase in fixed fee, and they believed that it was being held in abeyance pending the completion of the Edgewood contract.

In August 1941 the parties began negotiations for another project, hereinafter referred to as the Redstone project or contract. This contract was entered into on August 23, 1941, but before its execution plaintiffs were confronted with and required to sign a release identical in terms with the one referred to above. In May 1942 negotiations were begun for another project, hereinafter referred to as the Denver project or contract. Work on this project was begun immediately, before any formal contract was submitted to plaintiffs. The Denver contract was executed by plaintiffs and defendant's contracting officer on June 2, 1942. On July 1, 1942, plaintiffs executed and delivered to defendant a third release pertaining to the Edgewood contract. This release is quoted in finding 19.

As heretofore indicated, the Edgewood project was completed on March 6, 1943. On September 7, 1943, defendant forwarded to plaintiffs a "Final Release"[2] on the Edgewood work, to be executed and returned. By letter dated September 16, 1943, plaintiffs returned duly executed (as of September 13, 1943) the release quoted in finding 21. In this so-called "Final Release," plaintiffs excepted from the release a "claim for estimated fixed fee of $50,000." The re-

1. The extent of the change in the scope of the work is not material to the present phase of the case. See finding 8.
2. This release is not in issue here, nor is its possible effect upon either plaintiffs or defendant. In this opinion, "release" or "releases" refers only to the three releases executed by plaintiffs as prerequisites to the award of subsequent contracts, unless otherwise indicated.

maining fixed fee due plaintiffs under the Edgewood contract was paid on November 30, 1943.

On March 16, 1944, plaintiffs submitted to the Contracting Officer their claim in writing "for an equitable adjustment of fee * * *." On August 29, 1944, the Contracting Officer denied the claim. His decision is quoted in part in finding 23. The denial of the claim was based on the releases which are here in issue.

Plaintiffs, on September 28, 1944, appealed the ruling of the Contracting Officer, asserting that there was no valid release which precluded consideration of plaintiffs' claim. On October 26, 1944, plaintiffs were furnished a copy of the Contracting Officer's findings of fact in connection with plaintiffs' appeal. These findings of fact contained a finding of "the scope of the work stated under the original contract," but made no reference to the difference between the scope of the work as originally contemplated and as finally performed.

On April 3, 1945, the Chief of Engineers denied plaintiffs' appeal on the ground that "the record shows that in consideration of the award of other Government contracts you executed releases of all claims for additional fee under the subject contract." The decision of the Chief of Engineers is quoted in part in finding 26.

On May 3, 1945, plaintiffs appealed this decision to the Secretary of War. On October 18, 1945, the War Department Board of Contract Appeals reported to "the president of the Board as the authorized representative of the Secretary of War" its recommendation that the appeal be dismissed, and the president of the Board dismissed the appeal, BCA No. 1061.

The releases in question were required of plaintiffs pursuant to a directive of the Secretary of War, which is quoted in part in finding 10. It provided in effect that until a release or settlement of an architect-engineer's claim for additional fixed fee was obtained, no subsequent contract should be awarded to the architect-engineer.

Plaintiffs contend that the releases are without force and effect because (1) the exaction of the releases was contrary to public policy, (2) the Secretary of War had no authority to require the releases from plaintiffs, (3) there was no consideration for the releases, (4) all prior negotiations, including the releases, leading up to the Huntsville, Redstone, and Denver contracts were merged in those contracts, which made no mention of the releases, (5) the releases were executed by plaintiffs under duress, and (6) the claim for increased fee is not barred by the releases even if they are valid. Defendant contends that the releases are valid, and that under their terms plaintiffs are precluded from recovery.

The parties, in arguing their respective contentions, have not contended that the later releases superseded the earlier ones, and have assumed that the releases must stand or fall together. Defendant does not contend that the decision of the Contracting Officer, affirmed on appeal, is final under the terms of the contract.

By order of the court dated October 1, 1948, the proceedings in this case were, on defendant's motion pursuant to old Rule 39 (b) [new Rule 38(b)], limited to the preliminary question of the validity of the releases. The parties have, without objection, also treated as before us the question as to whether, assuming the releases are valid, recovery is precluded by their terms. The contentions on both sides have been fully presented in the briefs and argument, and we consider this issue as regularly presented.

Although we are not persuaded by plaintiffs' argument and cases in support of its first four contentions, we need not, in view of the conclusions we have reached, decide the issues raised by those contentions.

Plaintiffs' fifth contention is that the releases were executed under duress. The evidence on this issue is set forth in our findings 9–12. Plaintiffs have contended that defendant exerted economic pressure as a result of which the plaintiffs were forced either to execute the releases, or go out of business. The evidence reveals that this may be true insofar as the first release is concerned. However, an examination of the evidence reveals a total failure of proof of coercion or duress insofar as the second and third releases are concerned. After

signing the first release, plaintiffs were awarded the Huntsville contract, which provided for a completion time of 13 months and a fixed fee of $147,000. By change orders the time was extended to 18 months and the fixed fee was increased to $300,000. The Huntsville contract was signed on July 16, 1941. The second release was signed on August 23, 1941, in connection with the Redstone contract. To say that the same economic pressure which motivated plaintiffs in signing the first release still existed is to ignore the facts. There is also no proof from which coercion or economic pressure can be inferred as to the third release, which was executed on July 1, 1942, in connection with the Denver contract. Thus, even though we assume that the first release was entered into under duress, plaintiffs have failed to establish that any such duress was present at the time the second and third releases were executed. We accordingly must reject plaintiffs' contention of duress, on the ground of failure of proof.

Plaintiffs' final contention is that the releases do not by their terms preclude recovery of the claimed increase in fixed fee.

The first two releases signed by plaintiffs are identical in terms. They read in part:

"* * *. This release extends to and is applicable only to claims arising out of work and services performed or authorized to be performed prior to the date of this instrument, except that this release shall not include any adjustment of the fixed fee by reason of additional work or services where the provisions of the contract require that such adjustment be made at the termination of the contract. * * *"

The third release has somewhat different provisions. It reads in part as follows:

"* * *. This release extends to and is applicable only to claims for additional fee arising out of work or services performed or authorized to be performed by the . * * * contract * * *; provided that this release will not deprive the contractor of any adjustment of the fixed fee by reason of additional work or services where such adjustment is to be made at the completion or termination of the contract or is otherwise postponed in accordance with the provisions of the above numbered contract."

Plaintiffs contend that there was a change in the scope of the work, and that under the terms of the contract the adjustment of the fixed fee could be determined only when the work was completed. This, plaintiffs say, brings their claim within the except clauses of the releases.

Defendant, in contending that the claim here asserted does not come within the except clauses of the releases, urges that there was no express provision in the contract requiring that adjustment of plaintiffs' fee be made at the termination of the contract. On the contrary, defendant says, Article XI of the contract provides that such an adjustment should be made *at the time of the change.* Defendant also contends that there is no evidence that a postponement of the adjustment was authorized, and argues that it could not have been authorized under the terms of the contract. Finally, defendants says that if there was any disagreement between the parties, it became a matter of dispute, for settlement in accordance with the provisions of Articles IX and X of the contract.[3]

We find no merit in defendant's final argument. As will be seen later, there

---

3. "Article IX. 1. *The Contracting Officer's Decisions.*—The extent and character of the work to be done by the Architect-Engineer shall be subject to the general supervision, direction, control, and approval of the Contracting Officer to whom the Architect-Engineer shall report and be responsible. In the event that there should be any dispute with regard to the extent and character of the work to be done, the decision of the Contracting Officer shall govern but the Architect-Engineer shall have the right of appeal to the Quartermaster General, whose decision thereon shall be final.

"Article X. 1. *Disputes.*—Except as otherwise specifically provided herein, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the Architect-Engineer within 30 days to the Quarter-

was no disagreement between the parties so as to give rise to the procedures of Articles IX and X.

We have found, and defendant's counsel during the taking of testimony in this case conceded, that there was a change by way of increase in the scope of the work under the Edgewood contract. Article XI, on which the parties rely for their conflicting premises, provides in part as follows:

> "Article XI. 1. *Change in Scope of Project.*—The Contracting Officer may at any time, by a written order, make changes in the scope of the work. Should the scope of the work be changed materially for any reason an equitable adjustment in the Architect-Engineer's fixed fee will be made as may be agreed upon between the Architect-Engineer and the Contracting Officer at the time of such change."

 Under this Article, plaintiffs were entitled to an equitable adjustment of their fee because of the change in the scope of the work. MacDougald Construction Co. v. United States, 122 Ct.Cl. 210, 257; W. E. Callahan Construction Co. v. United States, 91 Ct.Cl. 538, 659. It has heretofore been held in effect that the provision for such an adjustment is a peremptory requirement and must be followed. As we said in Callahan Walker Construction Co. v. United States, 95 Ct.Cl. 314, at page 327:

> "The reason for this assumption is manifest, for if it were not an absolute requirement but left to the opinion or judgment of the contracting officer, it would be no protection whatever to the plaintiff, and would permit the

master General or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto, subject to written appeal within 30 days by the Architect-Engineer to the Secretary of War or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime the Architect-Engineer shall diligently proceed with the work as directed."

4. Of the $26.5 million total cost of the

taking of plaintiff's work without compensation."

Although this case was reversed by the Supreme Court, 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49, on the ground that what constituted an "equitable adjustment" was a question of fact, and that if the contracting officer erroneously decided this question, Article 15 of the contract provided the only avenue of relief, we do not understand this decision to lessen the requirement that there be an adjustment of some sort, equitable or otherwise.

 Plaintiffs sought in good faith and in accordance with the terms of the contract, an adjustment of their fee because of the greatly increased scope of the work. See findings 6 and 7. Defendant made no response in writing to these requests, but instead *orally* urged plaintiffs to proceed with the contract work and to postpone determination of the exact scope of the work and the consideration of additional compensation until the conclusion of the contract. Defendant has offered no explanation as to why this course of conduct was pursued. Whatever the reasons, however, plaintiffs complied with the promptings and completed the work with no adjustment in their fee. Our experience in the many cases of this type coming before the court indicates that frequently no other course is open to the contractor. See, e. g., Winn-Senter Construction Co. v. United States, 75 F.Supp. 255, 110 Ct.Cl. 34, 65.

The evidence shows that defendant ordered additional work done from time to time without specifying at the time of the order whether the work was to be done under the instant contract or would be covered by a change order.[4] Such a situa-

Edgewood project, approximately $9 million was added by defendant by way of change orders. Thus the total cost of the work under the contract was over $17 million as compared with defendant's original estimate of cost of $5,559,273. It should be noted that the actual cost of the work was considerably less than the final estimate of cost of February 24, 1941, which indicated that the cost would be over $19 million.

tion is not uncommon. Under the circumstances of this case, neither the quantity of the increased work not covered by change orders, nor the cost thereof, nor the time required therefor, could be determined prior to the completion of the work. Stated in other terms, it would have been impossible, under these facts, for the parties to agree, upon an equitable adjustment of plaintiffs' fee at the precise time of the changes in the scope of the work. Accordingly, the parties agreed to defer the adjustment of the increase in fee until such time as an equitable adjustment could be made, i. e., the completion of the contract work. As we said in W. H. Armstrong & Co. v. United States, 98 Ct.Cl. 519, at page 528:

> "Ordinary prudence on the part of each would have required what was done here, viz, the deferment of consideration of the cost to a later time. Our observation of cases litigated here tells us that this kind of prudence is frequently practiced in such situations."

The inherent fairness and wisdom of such a policy in the present case, both to the plaintiffs and to the Government, is apparent. The original estimate of cost, upon which plaintiffs' fixed fee was based, had proved grossly erroneous. Rather than rely on another estimate which might prove just as unfair to either party, the parties agreed to defer the adjustment of plaintiffs' fee until the completion of the work.

Defendant has urged that this deferment could not have been authorized under the terms of the contract. We are unable to agree. Defendant emphasizes that the language or Article XI contains the phrase *at the time of such change* but ignores the fact that the Article also says that an adjustment will be made *as may be agreed upon* by the parties at the time of the change in the scope of the work. As we have indicated, the parties agreed *at the time of such change* to postpone the question of the adjustment of plaintiffs' fee until the termination of the work. Thus the contract may be interpreted, within the spirit of Article XI, if not the rigid interpretation insisted upon by defendant, to require that under the facts of this case an adjustment in plaintiffs' fee be made at the completion of the project. Defendant has argued that the change in the scope of the work was fully determined by the estimate of February 24, 1941, which, as matters finally turned out, was in excess of the actual cost of the project. If this be true, however, it is difficult to understand why defendant's officers at that time took the position that no equitable adjustment could then be made, and urged plaintiffs to go ahead with the work without adjustment of their fee. We have found that at that time the actual extent of the increase in the scope of the work could not have been determined, and a reasonable interpretation of Article XI does not require that we now insist that the parties should have done that which it was impossible to do. Under the terms of Article XI, a more reasonable interpretation would require that the parties do just what was done here i. e., agree to defer the consideration of plaintiffs' claim until such time as an *equitable* (accurate) adjustment could be made. Viewed in this light, we are of the opinion that plaintiffs' contention is correct. Because Article XI does not prohibit such an agreement, and indeed necessitates it here, and because the agreement was made prior to the execution of any of the releases here in issue, plaintiffs' claim was excepted from the releases as a contract "requirement" that an adjustment be made at the termination of the work.

There is, however, an alternative ground upon which plaintiffs are entitled to recover. In general, an officer authorized to make a contract for the United States has the implied authority thereafter to modify it, particularly where, as here, it is in the best interests of the United States to do so. Branch Banking & Trust Co. v. United States, 98 F.Supp. 757, 120 Ct.Cl. 72, certiorari denied 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669. If Article XI is read, as defendant contends, to require that an adjustment be made if at all at the time of the change in the scope of the work, then it is a requirement that can be

modified if it is in the best interests of the United States to do so. Nor does the fact that the representations of the defendant's officers were oral compel a different conclusion under the circumstances. *Stiers v. United States,* 121 Ct.Cl. 157.

There was, as we have found, a change in the scope of the work, and there existed on the part of the government a positive duty to make an equitable adjustment as required by Article XI of the contract. *MacDougald Construction Co. v. United States, supra.* Under the facts of this case, no *equitable* adjustment could be made until the completion of the work, and the parties so agreed. The defendant's obligation to make such an adjustment was not thereby extinguished, but it was properly deferred. Such a modification of the terms of the original contract would give rise to a requirement on the part of defendant to adjust plaintiffs' fee at the termination of the contract. *W. H. Armstrong and Co. v. United States, supra.*

Accordingly, whether Article XI permitted, under the facts of this case, the making of an adjustment in plaintiffs' fixed fee at the termination of the contract, or whether the agreement to defer consideration of plaintiffs' claim amounted to a modification of Article XI of the contract, there existed at the time the releases were entered into a valid agreement amounting to a "requirement" that plaintiffs' claim would be considered at the termination of the contract, and the claim was therefore excepted from the operation of the releases. It accordingly follows, and we hold, that plaintiffs' claim is not barred by the releases on which defendant relies.

The great disparity between the estimated cost of approximately $5,500,000, and an estimated completion time of 10 months, on which plaintiffs' fee was based, and the actual cost of over $17,000,000, and a completion time of 22 months, with no corresponding increase in the fixed fee, lends support to the conclusions herein expressed.

The case is referred to a commissioner of this court for such further proceedings as may be required.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.

### Findings of Fact

The court makes findings of fact, based upon the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, as follows:

1. Plaintiffs, Whitman, Requardt and Associates, are engineers trading as a partnership with offices in Baltimore. The contract out of which this action arose was executed by the partnership of Whitman, Requardt and Smith. The earlier partnership was succeeded by the present one, and plaintiffs in this action were substituted for the original partnership in the contract by an agreement supplemental thereto. There is no issue concerning the identity of parties plaintiff. Reference is accordingly made hereinafter to plaintiffs as one of the contracting parties without further distinction between the two partnerships.

By order of the court dated October 1, 1948, the proceedings in this case were limited to "the preliminary question of the validity of the release referred to in the petition."

2. Between July 25 and August 6, 1940, plaintiffs had several conferences with officers of defendant relative to the employment of plaintiffs by defendant in the design and supervision of construction of a project which the Chemical Warfare Service proposed to erect at Edgewood, Maryland. Defendant did not have detailed plans for the project. It was contemplated that the engineers ultimately employed would prepare the plans and drawings. Such preliminary sketches and data as defendant had prepared and showed to plaintiffs (1) were insufficient for plaintiffs to formulate an estimate of their own as to the probable cost of the work to be done or of the time that would be required to do it and (2) indicated that the plant to be erected and the equipment to be installed therein were novel and complicated. Cost estimates by defendant mentioned to plaintiffs in the course of negotiations ranged from $4 million to $6 million.

3. On August 2, 1940, plaintiffs were given a form of cost-plus-fixed-fee contract for engineering services and were requested to signify their acceptance or rejection the next day if possible. The contract form indicated that plaintiffs, as the Architect-Engineer of the project, would be reimbursed for costs and expenses and would receive, as compensation for their services, a fixed fee of $60,400. Plaintiffs expressed the view that the fee should be higher, and were told it was not a subject for negotiation. Defendant's officers advised plaintiffs that the amount of the fixed fee was based upon defendant's estimate of the cost of the project [5] as $5,559,273,[6] and that the estimated time required would be 10 or 12 months.

Plaintiffs relied upon defendant's estimate of the cost of and time for the project as being as reasonably accurate and determinative of the extent and scope of the work as could be made at the existing stage of the plans therefor.[7]

4. On August 6, 1940, plaintiffs entered into Contract No. W 6297 qm–5 with defendant.[8]

By the terms of the contract defendant engaged the services of plaintiffs as the Architect-Engineer "for. the preparation of necessary designs, drawings, specifications, and technical supervision for the construction of new plant facilities including equipment and the rehabilitation of existing plant facilities," listed in terms of 15 separate "plants" and various warehouses, facilities, and utilities, at Edgewood Arsenal, in Maryland, "estimated to cost $5,559,273 and to be completed within 10 months from the date hereof, which estimates of cost and time are based on the best available data which are on file in the office of the Contracting Officer."

Under the contract plaintiffs, as the Architect-Engineer, agreed and undertook to—

"a. Make the necessary surveys and supervise test borings and foundation exploration.

"b. Prepare preliminary studies, sketches, cost estimates and progress schedules together with approximate estimates of materials requirements.

"c. Adapt Government designs, drawings, specifications, details and standards to the work whenever same are furnished or designated by the Contracting Officer.

"d. Obtain necessary permits and approvals from all local, State and Federal authorities.

"e. When preliminary drawings are approved by the Contracting Officer, prepare final designs, detailed working drawings and specifications * * *.

"f. Establish the governing lines, bench marks and grades and supervise the work designed by him * *.

"g. Check and approve all shop and working drawings * * *.

"h. Make customary field tests of concrete and concrete aggregates and other materials * * * and inspect all materials and workmanship at the site * * *.

"k. Perform all other architectural and engineering services within the scope of this contract, required by the Contracting Officer * * *."

5. The contract contained the following provisions:

"Article IV. 1. *Period of Service.* —The period of service of the Archi-

---

5. At the time, defendant had and applied a scale of fees for architectural and engineering services based upon its estimated cost of the services to be rendered. Cf. finding 10(b).

6. Plaintiffs were not given a breakdown of defendant's estimate until several months later. Cf. finding 6.

7. At that time neither plaintiffs nor defendant had sufficient information to enable them to determine the amount or extent of the work required under the contract.

8. This was plaintiffs' initial contract of its kind, and the second contract covering work of a similar nature awarded by the Army.

tect-Engineer is estimated as 10 months but will extend to the time of the completion of the contract for the construction of the project, and thereafter until the services set forth in Paragraph 1 of Article I are completed or otherwise terminated.

"Article V. 1. *Fixed-Fee and Reimbursement of Expenditures.*—In consideration for his undertakings under the contract, the Architect-Engineer shall receive the following:

"a. A fixed fee in the amount of sixty thousand four hundred Dollars ($60,400) which shall constitute complete compensation for the Architect-Engineer's services, including all overhead expenses except as otherwise herein expressly provided.

"b. Reimbursement for * * * expenditures: * * *.

"Article VII. 1. *Method of Payment.*—* * * Upon final completion of the project, the Architect-Engineer shall be paid the unpaid balance of any money due the Architect-Engineer hereunder. Prior to final payment under the contract and as a condition precedent thereto, the Architect-Engineer shall execute and deliver to the Contracting Officer a release, in such form and containing such provisions as shall be approved by the Contracting Officer, of claims against the United States arising under or by virtue of this contract * * *.

"Article IX. 1. *The Contracting Officer's Decisions.*—The extent and character of the work to be done by the Architect-Engineer shall be subject to the general supervision, direction, control and approval of the Contracting Officer to whom the Architect-Engineer shall report and be responsible. In the event that there should be any dispute with regard to the extent and character of the work to be done, the decision of the Contracting Officer shall govern but the Architect-Engineer shall have the right of appeal to The Quartermaster General, whose decision thereon shall be final.

"Article X. 1. *Disputes.*—Except as otherwise specifically provided herein, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the Architect-Engineer within 30 days to The Quartermaster General or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto, subject to written appeal within 30 days by the Architect-Engineer to the Secretary of War or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime the Architect-Engineer shall diligently proceed with the work as directed.

"Article XI. 1. *Change in Scope of Project.*—The Contracting Officer may at any time, by a written order, make changes in the scope of the work. Should the scope of the work be changed materially for any reason an equitable adjustment in the Architect-Engineer's fixed fee will be made as may be agreed upon between the Architect-Engineer and the Contracting Officer at the time of such change.

"2. If for any reason the time required of the Architect-Engineer is extended for more than thirty calendar days beyond that originally estimated in Article IV, there shall be a prompt and equitable adjustment in the Architect-Engineer's fixed fee as may be agreed upon between the Architect-Engineer and the Contracting Officer.

"Article XXI. 1. *Definitions.*—a. The term 'his duly authorized representative' shall mean any person authorized by The Quartermaster General of the Army to act for him, other than the Contracting Officer.

"b. Except for the original signing of this contract, the term 'Contracting Officer' as used herein shall include his duly appointed successor or his authorized representative."

6. By September, 1940, plaintiffs realized that the cost of the work to be done would exceed defendant's original estimate of cost.

On November 6, 1940, a new estimate by defendant placed the cost at $11,740,000. Information available to plaintiffs in November, 1940, indicated to them that the cost would approximate $13 million, and in December the cost was similarly indicated to be $16 million.

Some of these increases in cost were the result of additional work which the parties later agreed was outside the contract in suit.

By letter dated January 28, 1941, plaintiffs asked defendant for a breakdown of the cost as originally estimated, and the breakdown was forwarded to and received by plaintiffs with defendant's letter of February 6, 1941. Plaintiffs had not theretofore asked for or received the detailed estimate of cost.

On February 17, 1941, plaintiffs wrote defendant:

"* * * the total obligation of the Government * * * [was] over $16,000,000 as of February 14, 1941. * *

* *. * We understand the [building] contractors have been given a supplemental contract . * * *; the engineers, however, have not.

"* * * we feel that the engineers * * * should have augmentation of their contracts * * *."

7. On February 24, 1941, defendant made a new estimate of the cost of the project in an amount in excess of $19 million.[9]

On March 26, 1941, plaintiffs wrote defendant as follows:

"* * * On February 17th, we wrote * * * outlining some of the differences between the originally estimated cost of the project and an estimate as of December 31, 1940. In this letter we expressed our opinion that we as engineers and the contractors should have augmentation of our contracts to include construction costs of the work then being prosecuted. We received no answer to this letter of February 17th.

"On February 18th, we wrote * * * for a further description of the construction originally contemplated at Edgewood and its estimate of cost as shown in our contract. This information will permit a clear differentiation to be made between original project and project as now being prosecuted. Colonel Leavey had previously sent us a breakdown of the estimate of construction cost, but this did not contain enough information on dimensions and type of buildings, length of railroads, length and sizes of sewer lines, length and area of roads, etc. We received no reply to our letter of February 18th.

"On March 5th [we were] sent * * . * forms in reference to supplemental contract for work being done in connection with the cantonment, camp and hospital. Under date of March 7th, we returned the forms and in our letter of that date, gave some of our reasons as to why the supplemental contract is not acceptable. In this letter, we suggested a conference wherein cost estimates and fees for the work now being undertaken can be established satisfactory to ourselves and the Government. We have had no reply to this letter.

"From time to time, the Constructing Quartermaster has directed changes in the scope of the work and in good faith we have undertaken the engineering, and the contractor has undertaken the construction of these augmentations and changes in the project. We have been ready at all times for conferences looking to the reestablishment of fixed fees because of such changes in the scope of the work. * * *

"We believe that in simple fairness to us and the contractors on this project, an early conference should be held wherein the originally contemplated project, the original estimates, changes in the scope of the work, sub-

9. The total amount of the revised estimate was $20,615,000. This estimate included 17 buildings at Aberdeen costing approximately $950,000. These additional buildings are not material to this action.

sequent estimates and other pertinent features may be taken into consideration so that agreed upon estimated cost of the project and agreed upon amounts of fixed fees may be established. * * *"

8. Defendant made no response in writing to the foregoing and other requests by plaintiffs for increase of the fixed fee for the work under the contract in suit.

Increases in the work covered by the contract in suit were made by defendant as the contract work progressed.[10] Defendant never formally characterized these increases as changes in the scope of the work. During the course of the contract work increases in the scope of that work were ordered by defendant. The extent of such increases is not established by the evidence.[11] The extent of such increases could not have been fully and accurately determined prior to the completion of the contract work.[12]

Defendant's officers orally urged plaintiffs to proceed with the contract work and to postpone determination of the exact scope of such work and the consideration of additional compensation until the conclusion of the work. Except for the requests for readjustment recited herein, plaintiffs acceded to these promptings and completed the work.

9. In the early summer of 1941 plaintiffs were asked by defendant to make an inspection of sites for another project similar to the one under way at Edgewood. Following plaintiffs' recommendation of Huntsville, Alabama, as the location of the new project, such site was selected by defendant and plaintiffs were advised that they had been selected as Architect-Engineer of the new project. Plaintiffs promptly and prior to July 8, 1941, began preparations to move some personnel from Edgewood to Huntsville and to recruit other personnel. Because of the previous experience of the parties with the Edgewood project, the program given to plaintiffs for the Huntsville project and defendant's estimate of the cost of that project were well defined so that plaintiffs could determine for themselves the scope of the work to be done.

10. (a) On July 3, 1941, by direction of the Under Secretary of War, a memorandum was forwarded to the Chief of the Chemical Warfare Service and others in substance as follows:

"1. Reference is made to memoranda from this office dated April 24 and May 22 wherein it was directed that no subsequent contract on a cost-plus-a-fixed-fee basis will be awarded to an architect-engineer or contractor until he shall have signed a release in full settlement of fees on any previous contract.

"2. The form of release to be used in such cases is attached hereto. * *"

(b) The memorandum of April 24, 1941, follows, in part:

"1. In order to minimize litigation with respect to claims by constructors and architect-engineers for fees in addition to those fixed in the cost-plus-a-fixed fee form of contract, every effort should be made to secure final written agreement between the contracting officer and the contractor in full adjustment of any claim for additional fee the contractor may have. The purpose of the present form of cost-plus-a-fixed-fee contract is to agree in advance of the work as to the

---

10. While the contract work was under way, defendant added other work by change orders the actual cost of which was in excess of $9 million, and paid plaintiffs additional fixed fees as compensation therefor. These additional fees were based on defendant's estimates of the cost of the work. The change order work is not involved in this suit.

11. The extent of the increases in the scope of the work is not material to the present phase of the case. See Finding 1.

12. Defendant ordered additional work done from time to time without specifying at the time of the order whether the work was to be done under the instant contract or would be covered by a change order. Under the circumstances neither the quantity of work, nor the cost thereof, nor the time required therefor could be determined prior to completion.

fee to which the contractor shall be entitled, and the Congress has made it plain that no adjustment of the fixed fee shall be made on the basis of the actual cost of the work done under the contract.

"2. The Under Secretary of War directs that until final written agreement or release in full settlement of an architect-engineer's or of a contractor's fixed fee is obtained, no subsequent contract on a cost-plus-a-fixed-fee basis shall be awarded to such architect-engineer or contractor. * *"

11. On July 8, 1941, plaintiffs were advised for the first time that defendant's officers could not enter into the contract for the Huntsville project with plaintiffs unless and until plaintiffs had executed the release mentioned in the preceding finding, releasing claims for increased fees for the Edgewood project.[13]

12. In July 1941, the volume of engineering work for which plaintiffs were qualified and of the kind in which they were and had been engaged (1) was gradually being preempted by work in the national defense effort in which the Federal Government either was the employer of the engineers or had contracted with the employer of the engineers and (2) was appreciably declining in terms of State, county, and municipal projects.

Plaintiffs had listed themselves with the Navy Department, and knew that some work for engineers was either under way or in contemplation by the Maritime Commission. They had not established contracts either with the Navy Department or the Maritime Commission comparable with those they already had in the War Department.

When confronted with the release described in finding 10, plaintiffs reasonably believed that they had either to sign it and thereby clear the way for execution of the Huntsville contract or undergo a sharp downward readjustment in the volume of their business, including curtailment of personnel and general organization as the Edgewood project approached completion.

13. On July 10, 1941, plaintiffs executed and delivered to defendant the following release:

"Whereas, the undersigned has a contract with the Government of the United States (Contract No. W–6297 qm-5, dated Aug. 6, 1940), as amended, for certain work at Edgewood, Md., and, whereas, it is deemed advisable by the parties thereto that final adjustment of all matters between the Government and the Contractor in respect of the fixed-fee stated in said contract as amended be made at this time;

"Now, therefore, in consideration of the award of another contract the contractor hereby releases the United States, its officers and agents, from any and all claims or demands for additional fee by virtue of work or services which, prior to this date, were performed or authorized to be performed by the contractor in connection with or incidental to the project involved in said contract. This release extends to and is applicable only to claims arising out of work and services performed or authorized to be performed prior to the date of this instrument, except that this release shall not include any adjustment of the fixed-fee by reason of additional work or services where the provisions of the contract require that such adjustment be made at the termination of the contract.

"And the contractor hereby agrees that there shall be no adjustment in the amount of the fixed-fee as provided in the contract, nor shall there be any claim for increased compensation for future work under the contract because of any error and/or omissions made in computing the original estimated cost of construction of the

---

13. On July 8, 1941, the only claim plaintiffs had arising out of the Edgewood contract was the claim for increase in the fixed fee. They believed that adjustment of the fee was being held in abeyance pending completion of the contract.

project or where the actual construction cost varies from the estimated cost."

It is not established by the evidence that any work or services under the contract were performed after July 10, 1941, which had not been authorized prior to that date.

14. On July 16, 1941, plaintiffs and defendant entered into Contract No. W 7120 qm-1 for the Huntsville project. This contract provided that "in consideration for his undertakings under the contract, the Architect-Engineer shall be paid * * * a fixed fee in the amount of * * * $147,000 which shall constitute complete compensation for the Architect-Engineer's services * * *." In addition to the fixed fee the Architect-Engineer was to be reimbursed for costs and expenses, as under the Edgewood contract. There was no mention in the Huntsville contract of the Edgewood contract or of the release of July 10, 1941. The period of service of the Huntsville contract was estimated as 13 months, and the cost of construction as $29 million.[14]

15. In August 1941, negotiations were begun between plaintiffs and defendant for another project, hereinafter referred to as the Redstone project or contract. The Redstone contract (No. DAW 7120 qm-3) was executed by plaintiffs and defendant on August 23, 1941. Before its execution plaintiffs were confronted with and signed a second release identical with the one set forth in finding 13.

The Redstone contract provided for a fixed fee of $22,673, for work estimated to extend over a period of 10 months and to cost $4,669,750. There was no mention in the Redstone contract of the Edgewood contract or of the release described in the preceding paragraph.

16. In May 1942, negotiations were begun between plaintiffs and defendant for work on another project hereinafter referred to as the Denver project or contract. Work on the Denver project was begun immediately by plaintiffs, before the

formal contract therefor was submitted to them.

17. Work on the contract in suit exclusive of change order work was substantially completed in June, 1942, having extended over a period of 22 months from the date of the contract. The cost of this work was in excess of $17 million.

18. The Denver contract was executed by plaintiffs and by defendant's contracting officer on June 2, 1942. It was approved by the Division Engineer on July 22, 1942. The relation of approvals by officers of echelons higher than the contracting officer to the authority of the contracting officer to make a binding commitment, as the same pertains to the Denver contract, is not established by the evidence.

The Denver contract contained no mention of the Edgewood contract or of the release described in the next succeeding finding.

19. On July 1, 1942, plaintiffs executed and delivered to defendant the following release:

"Whereas, the undersigned has a contract with the United States of America, hereinafter referred to as the Government (Contract No. W 6297 qm-5, dated 8/6/40), for certain work at Edgewood Arsenal, Maryland, and

"Whereas, it is deemed advisable by the parties thereto that final adjustment be made at this time of all matters between the Government and the Contractor in respect of the fixed fee stated in the above numbered contract as heretofore modified by any supplemental agreements and/or change orders executed by the parties thereto:

"Now, therefore, in consideration of the award of another contract by the Government, the Contractor hereby releases the Government, its officers and agents, of any and all claims or demands for additional fee by virtue of the work or services required of the Contractor by the above numbered contract as heretofore modified by

---

14. By change orders the contract period was increased to 18 months and the fixed fee was increased to approximately $300,000.

any supplemental agreements and/or change orders executed by the parties hereto. This release extends to and is applicable only to claims for additional fee arising out of work and services performed or authorized to be performed by the above numbered contract as heretofore modified by any supplemental agreements and/or change orders executed by the parties thereto; provided that this release will not deprive the contractor of any adjustment of the fixed fee by reason of additional work or services where such adjustment is to be made at the completion or termination of the contract or is otherwise postponed in accordance with the provisions of the above numbered contract.

"And the Contractor hereby agrees that there shall be no adjustment in the amount of the fixed fee provided in the above numbered contract as heretofore modified by any supplemental agreements and/or change orders executed by the parties thereto, nor shall there be any claim for increased compensation for future work under such contract, because of any error and/or omission made in computing the original or modified estimated cost of construction of the project or where the actual construction cost varies from the estimated cost."

20. Work under the contract in suit, as modified by change orders, was completed on March 6, 1943. The cost of the work as so modified was in excess of $26.5 million, of which approximately $9.5 million was for change order work.

21. By letter dated September 3, 1943, defendant asked plaintiffs to forward a voucher covering "the final fixed fee due you" under the contract in suit.

By letter dated September 7, 1943, defendant forwarded to plaintiffs a "Final Release" to be executed and returned.

By letter dated September 16, 1943, plaintiffs submitted a voucher and returned, duly executed (as of September 13, 1943), the following release:

"The work under the * * * contract * * * having been completed and finally accepted, the United States of America, its officers · and agents, are hereby released from all claims and demands whatsoever arising under or by virtue of said contract, except—

"(a) Claims in stated or estimated amounts, as follows:

"Claim for estimated fixed fee ............$50,000.

"(b) Any and all claims arising out of the performance of this contract based upon the responsibility of the undersigned to third parties not known at the time of executing this release.

"The remaining fee due plaintiffs was paid on November 30, 1943."

22. On March 16, 1944, plaintiffs submitted to the contracting officer their claim in writing "for an equitable adjustment of fee * * *." The statement of claim recited (1) that actual construction costs exclusive of overhead were $17,176,369; (2) that the last of the contract work was substantially completed 22 months after the date of the contract; (3) that the description of the work to be done, as originally given to plaintiffs, did not call for all of the work which was performed; (4) that the contracting officer never by written order made changes in the scope of the work; (5) that plaintiffs' written requests for the establishment of changes in scope and augmentation of the fee were never answered; and (6) the claim for adjustment of the fee was based on actual cost rather than on the estimates of February 24 and March 7, 1941.

23. On August 29, 1944, the contracting officer denied the claim in a letter quoted in part below.

"* * * In consideration of the award to you of a later Government contract, you executed release of claim for additional fee under the subject contract. Such release was executed subsequent to the completion of the work for which additional fee is claimed.

"In accordance with the provisions of Article X of the contract, it is my decision that such release of claim for additional fee is final and conclusive and precludes any further consideration of your claim for additional fee."

24. On September 28, 1944, plaintiffs appealed the ruling of the contracting officer to the Chief of Engineers and the Quartermaster General. The appeal asserted that there was no valid release which precluded consideration of plaintiffs' claim and that plaintiffs were entitled to additional fee "in the amount of $125,464, together with a further sum based on the extension of time beyond the contract time * * *."

25. On October 26, 1944, defendant forwarded to plaintiffs a copy of the contracting officer's findings of fact in connection with plaintiffs' appeal. The findings of fact referred to " * * * Contract No. W-6297-qm-5 * * * awarded on 6 August 1940 * * * at the estimated cost of construction of $5,559,273, for the fixed-fee of $60,400 and for an estimated period of service of 10 months" and continued:

"Modifications A to Z, inclusive, increased the net estimated cost of construction by $6,636,437, increased the net fixed-fee by $30,921, final totals being $12,407,810 and $91,321, respectively, and extended the period of service to 15 April 1943 * * *.

" * * * All work under the contract was substantially completed in March 1943. * * *"

The sum of the originally estimated cost, $5,559,273, and the increases in cost made by change orders, $6,636,437, is $12,195,710. This sum is $212,100 less than the total recited by the contracting officer. This amount represents the construction contractor's fee under the Edgewood contract. The cost of the contract work, exclusive of work ordered by change orders, was more than three times the originally estimated cost.

The contracting officer's findings of fact contained a finding of "the scope of the work stated under the original contract," but contained no finding of the work final-

ly performed except as stated hereinabove, and made no reference to the difference between the scope of the work as originally contemplated and as finally performed.

26. On April 3, 1945, the Chief of Engineers denied plaintiffs' appeal on the ground that "the record shows that in consideration of the award of other Government contracts you executed releases of all claims for additional fee under the subject contract." The decision of the Chief of Engineers further stated:

"You contend that the releases were executed upon the assurance of the Contracting Officer that they would not bar the consideration of subsequent claims for adjustment of your fee upon their merits. While the Contracting Officer should, of course, exercise the greatest care to make sure that information given or statements made to Contractors are correct, neither the Contracting Officer nor any other Government official can modify contract documents by placing verbal limitations thereon. Furthermore, the rule that parol evidence cannot be permitted to alter or modify the clear and unequivocal language of a written instrument precludes any revision of the express terms of the releases.

"You further contend that the claims for additional fee are saved from the release by the clause excepting adjustments 'of the fixed-fee by reason of additional work or services where the provisions of the contract require that such adjustment be made at the termination of the contract.' Under the express terms of this provision the only claims for additional fee excepted from the release are those for additional work which the contract specifically requires to be adjusted upon termination of the contract. As the contract does not "require" that an adjustment of fee for any items of work be made upon termination, the exception clause has no application. * * *"

27. On May 3, 1945, plaintiffs appealed the decision of the Chief of Engineers to

460

the Secretary of War. On October 18, 1945, the War Department Board of Contract Appeals reported "to the president of the Board as the authorized representative of the Secretary of War" its recommendation that the appeal be dismissed, and the president of the Board dismissed the appeal. B. C. A. No. 1061.

#### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein the court concludes that as a matter of law the plaintiff is not precluded from recovery by the releases referred to in the petition. The case is referred to a commissioner of this court for such further proceedings as may be required.