Howell, Judge,
delivered the opinion of the court:
Plaintiff’s claim in this case arises out of a unit price contract entered into with the defendant through the Corps of Engineers of the Army, whereby plaintiff agreed to furnish the material and perform the work for the clearing, grubbing, grading, draining, and paving of four additional runways at Moody Field, Valdosta, Georgia. Plaintiff asks judgment in the total amount of $127,545.72. Of this amount plaintiff claims approximately $100,000 as increased cost of hauling excavated material containing calico clay occasioned by the contracting officer’s order to exclude calico clay from the top 10 inches of the subgrade, which order plaintiff alleges amounted to a change in the contract plans and specifications entitling plaintiff to an equitable adjustment pursuant to Article 8 of the contract. The balance plaintiff claims as extra expenditures incurred in the performance of the contract, allegedly caused by interruptions in the work occasioned by defendant’s continued operation of the existing runways, this operation of the runways amounting to “unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications * * *” within the meaning of Article 4 of the contract.
Claim Under Article 3 of Contract
On July 16, 1943, the War Department, United States Engineer Office at Savannah, Georgia, issued solicitations for quotations, thereby inviting bids to be submitted to that *246 offiee by 12 o’clock noon on July 27, 1943, for the construction of four additional runways at Moody Field, Valdosta, Georgia. The solicitation stated that negotiations with one or more of those who submitted quotations would be carried on with the view to entering into a contract. The plans and. specifications revealed that the proposed runways were to be constructed adjacent to and partially surrounding an already existing airfield, the proposed runways to be connected with the existing paved runways by taxiways in several places;' that the proposed runways were to be constructed in an area that had been previously graded and covered with a light treatment for use as an auxiliary landing strip to the existing field. The proposed four runways were parallel to the existing paved runways and were to be 5,000 feet long and. 150 feet wide, with taxiways connecting the new runways with each other and with existing runways. Adjacent to the 150 foot wide paved runways were to be shoulders extending out approximately 175 feet and sloped for drainage purposes. Prospective bidders were furnished a drawing showing the contours for the Northwest-Southeast runway which they were told was typical of the other three runways; drawings showing the center line profiles of the other three runways ; a typical cross section of a runway; drawings of the drainage system and copies of the specifications.
On July 25, 1943, pursuant to the usual provision in the specifications that the contractor “should visit the site and acquaint himself as to local conditions, availability of water, electric power, roads, soil conditions, and buildings,” plaintiff sent four of its employees to the site. Mr. Earl J. Phillips, one of defendant’s engineers, accompanied plaintiff’s representatives on a tour of the project in one of defendant’s station wagons and pointed out the center lines of the proposed runways. At various points plaintiff’s representatives got -out of the station wagon and examined the soil noting the presence of varicolored clay, locally referred to as “calico clay,” in the area where the proposed runways were to be built and observing also that this material had been used in the construction of the existing landing strips. At the conclusion of the inspection tour, the party returned to the Engineer’s office on the site to study the plans and specifica *247 tions. No soil test results or findings were shown to plaintiff’s representatives and there would not have been sufficient timé for plaintiff to have had a laboratory analysis of the soil made before July 27, the date when the bids had to be submitted. From the plans containing the contour lines of the site of one runway and showing the existing elevations and the elevations of the work to be completed, plaintiff’s representatives estimated the probable amount of cut and fill and the length of the average haul required to do the work. In arriving at an average haul of approximately 600 feet, plaintiff contemplated a balanced grading job on which it would be possible to deposit material excavated from any given cut in the nearest fill area in the preparation of the embankment and subgrade. Plaintiff calculated that the average haul for required excavation would be 600 feet, and plaintiff planned to use short-haul equipment, i. e., tractors and scrapers or pans. The contract did not provide for payment of hauling of unclassified excavation or borrow material on the reservation until the length of the haul exceeded one-half mile. Plaintiff estimated the amount of probable overhaul and, in arriving at the unit prices for unclassified excavation and for borrow material for subbase and embankments, took into consideration the cost of an average haul of 600 feet and the cost of using short-haul equipment.
On the day following the inspection trip, plaintiff’s representatives made calculations of unit prices for the work proposed to be done under the contract, and phoned their estimate to Mr. MacDougald for use in estimating the bid. Bids were required by the government to be submitted by noon on July 27,1943, two days after the inspection trip. The bids were opened on July 27,1943. Of the 13 bids filed, plaintiff’s was declared the lowest and, following discussions relative to plaintiff’s ability to perform, the contract was awarded to plaintiff at its bid unit prices. During the discussion prior to the award, it was disclosed that plaintiff, before submitting its bid, had reduced its price on item No. 6, “Sand for base course,” from $2.25 to $0.50 per cubic yard on the mistaken assumption that sand could be secured on the site. When the mistake was discovered, plaintiff’s president agreed to stand upon the $0.50 price bid, which amounted to a reduction in *248 value of approximately $49,000 on the estimated quantities. A letter agreement was signed by the parties on that same day and a formal contract was executed on August 14,1943. The contract price, based upon estimated quantities for which unit price bids were submitted, was $521,612.30 (Finding No. 12).
The contract provided that work should be commenced on or before August 1,1943, and completed on or before November 24, 1943. The work to be performed and the period of performance were changed by 14 modifications. The period of performance was extended by several modifications for a total of 194 calendar days to June 15,1944 (Finding No. 13). The principal modification, designated Modification 2, dated September 10, 1943, provided in general for a redesign of the pavements to support a gross wheel load of 30,000 pounds in lieu of the 10,000 pounds provided for in the original plan.
A typical cross section for the runways contained in the plans, and upon which plaintiff based its bid, provided for a compacted subgrade at the top of the embankment. Upon this subgrade was to be placed a 2-inch compacted sub-base course consisting of “select material — topsoil and/or sand clay or sand.” The top limit of this 2-inch sub-base course was also labeled “subgrade” on the cross section. On top of the 2-inch sub-base course was shown a compacted 6-inch base course of an artificial mixture of not more than 20 percent clay, 15 percent silt, and not less than 65 percent sand. Upon this base course was to be placed a 1-inch binder of aggregate and bituminous materials. The resulting construction of compacted subgrade, combined base courses and pavement was designed to support a gross wheel load of 10,000 pounds.
Prior to the commencement of grading operations on August 9,1943, a new plan or drawing was prepared indicating a proposed redesign of the runways to accommodate an increase in the wheel load capacity from 10,000 pounds to 30,000 pounds. This drawing, marked Revision A, dated August 3, 1943 and entitled “Typical Grading and Paving Section,” was later incorporated in Modification 2, issued September 10, 1943, referred to above. Plaintiff was not shown this drawing or advised of the proposal to redesign the runways until the modification was actually issued in September.
*249 Grading operations were commenced on'August 9, 1943 at the northwest end of the Northwest-Southeast runway. Within a few days, material having a high clay content was encountered between stations 12 and 38 of this runway. The contracting officer determined that this material was unsuitable for use in the embankment under the areas to be paved, and plaintiff was directed to exclude it throughout this portion of the subgrade to a depth of 10 inches below the base elevation of the 2-inch sub-base course, and to backfill this zone with other material found on the site. When this clay was found in its so-called “natural state” in the specified top 10 inches of the subgrade, as shown on the original drawings, plaintiff was required to undercut it for the entire 10 inches and backfill with other soil. Approximately 12,000 cubic yards of clay Avas so undercut and removed (Finding No. 23). In areas which had been previously graded the year before, clay was found in layers of from 4 to 6 inches and is referred to by the parties as clay in its “artificial state.” This clay mixture was encountered throughout the area which had been previously graded, and where the materials encountered contained more than 10 or 15 percent clay, by visual inspection, plaintiff was required to remove such material and separate the clay from the other materials before using it as fill in the 10-inch area immediately beneath the sub-base course.
Clay in its natural state was encountered in two runways, between stations 12 and 38 in the Northwest-Southeast runway, and between stations 2 and 20 of the Northeast-Southwest runway. The elevations of these areas where paving was required, were generally below the final grade line of the embankment and required fill. The clay was removed by excavation below the final grade line to a depth of 10 inches beneath the 2-inch sub-base course. Undercutting was not performed in any of the shoulder areas except where required excavation was performed and clay was encountered in its natural state. A small strip was undercut in the shoulder area of the Northwest-Southeast runway along the south side for about 700 feet and refilled with suitable material to provide drainage, away from the runway. Other shoulder areas of this runway were provided drainage by bleeder lines, con *250 structed by undercutting and refilling strips of pan widths from 8-to 10 feet wide, at intervals of about 200 feet along the runway. They were cut at approximate right angles from the edge of the runway to a level approximately 10 inches below the sub-base course and extended out over the shoulder area for a distance of about 75 feet to where natural drainage would occur. The shoulders were graded to a slope of about 1.5 to 2 percent away from the edge of the runways.
Modification 2 was issued on September 10, 1943. The changes called for related primarily to the pavement. No changes were indicated in the construction of the base courses or the subgrade either in Modification 2, the new specifications thereafter issued, or in drawing MDY2/71, revised August 3,1943, and incorporated in the Modification.
During the entire course of the construction, plaintiff was required to exclude as unsuitable, any material containing more than 10 or 15 percent of calico clay from beneath the paved areas within 10 inches of the base elevation of the 2-inch sub-base course as shown on the drawings. Although soil tests were made prior to the awarding of the contract by defendant’s engineers, and also during the entire performance period, none of the results of such tests were furnished plaintiff nor were they put in evidence herein by defendant. Mr. Phillips, defendant’s senior civilian engineer and supervisor of construction, testified that he had no knowledge that the calico clay would be excluded from the embankment at the time plaintiff’s representatives visited the site and did not discuss the matter with them.
As a result of the exclusion of calico clay in its artificial and natural states as described above, and the backfilling with materials deemed suitable by defendant, plaintiff constructed -a 12-inch course of materials meeting the contract specifications for the 2-inch sub-base course shown on the contract drawings. Another result of this procedure was to turn the job from a generally balanced short haul grading job to an unbalanced grading job requiring a much longer average haul ■than could have been reasonably anticipated from the drawings. One reason for the longer haul was that plaintiff was prevented from placing much of the required excavation containing more than 15 percent calico clay in the fill areas *251 nearest the excavation. Some of this material was placed in the runway paved areas which were below the 12 inches beneath the 6-inch base-course, but very few areas of the runways were deeper than 12 inches below such course. Calico clay found in the northwest end of the Northwest-Southeast ■runway had to be placed in the south end zone around station 56. Good sand-clay material found in the shoulder area of the east end of the East-West runway was used as runway fill all the way back to the west end of that runway. A deep fill in the east end zone of the East-West runway which was adjacent to a cut of good materials at that end, was filled largely with clay which was cross-hauled from the- northeast end of the Northeast-Southwest runway. The deepest cut of required excavation was on the south end of the Northeast-Southwest runway, and the top two-feet of this cut was sand clay, but below this was calico clay in its natural state. The south end zone of this runway required a small amount of fill. It was first filled from this cut, but the remaining calico clay had to be hauled to end zones of other runways or to the outside portion of the shoulder areas. Good material found on the west side of the north end of the North-South runway was used as a reserve and was placed in portions of runways all over the area, wherever it was required. Wherever clay was encountered in the shoulder areas it was not permitted to -be placed in the nearest adjacent fills but had to be hauled-to deep fills in the end zones or to the outside areas of the shoulders. Equipment had to be changed from time to tiipe as long or short hauls- were required, depending upon the : materials encountered in the required excavation. Plaintiff had planned to use pans and crawler tractors, anticipating a short haul job, but as the work was actually performed, it became necessary to acquire an additional elevator grader for excavation and loading and additional trucks and euclids, for the longer hauls in placing the material. ,.. ,
Plaintiff was paid for any clay material undercut as unclassified excavation. The contract did not provide' specifically for payment for haul as such unless the haul was more than one-half mile in length. However, one of the elements considered in arriving at plaintiff’s bid unit price for unclassified excavation was the probable cost of hauling the *252 material. In arriving at the,bid price of $0.2.6 per cubieyard, plaintiff bad figured on a short haul averaging 600 feet for most of the work and the use of pans and scrapers as equipment. If plaintiff had known that it would not be able to place cut material in the nearest fill, it would have planned for longer average hauls and the use of long haul equipment, and the unit price bid for unclassified excavation would undoubtedly have been greater. Furthermore, under the contract, the construction of the 2-inch sub-base course of select material was paid for on the same basis as embankment construction. Howevér, it was a much more expensive operation than embankment construction, and the appreciable increase in the quantity of such base work required resulted in a considerable increase in the contractor’s costs.
Plaintiff contends that the order to exclude calico clay in its natural state and all material containing more than 15 percent calico clay in its artificial state, from the top 10 inches of the embankment subgrade, constituted a change in the contract plans and specifications under Article 3[1] of the contract for which it is entitled to an equitable adjustment to cover its increased costs. Defendant concedes that the order to undercut the calico clay in its natural state did constitute a change in the plans and specifications, but urges that the exclusion of material containing more than 15 percent of calico clay in its artificial state did not constitute such a change. Defendant contends that the latter exclusion was ordered by the contracting officer pursuant to his authority to determine the suitability of material going into the embankment as provided for in Section III, paragraphs 3.05 (b) and (c) of the specifications. In answer to this plaintiff insists that the contracting officer’s right to determine suitability of materials in the embankment is limited by Section IV of the specifications relating to the subgrade. The two Sections in question provide in part as follows:
Section III — Excavation, Embankment and Gbading
3.05 Embarilcment. * * *
(b) Embankments for all areas except those in paved areas shall be formed of suitable material placed in successive layers of not more than six (6) inches in depth, *253 loose measurement, to the full width of that part of the cross-section being constructed. The embankment material shall not contain rubbish, roots, logs, weeds, stumps or other decayable matter.
(c) Embankments in and under paved areas shall be formed of suitable material placed in successive layers of not more than four (4) inches in depth, loose measurement, to the full width of that part of the cross-section being constructed.
* # * $ *
Section XV — Preparation oe Subgrade por Base
4.01 Description. — This item shall consist of. the preparation and conditioning of the subgrade to the full width of the paved area in accordance with these specifications and in conformity with the lines, grades, and cross-section shown on the plans. The item shall be performed after the earthwork has been substantially completed and all adjacent drainage structures have been completed and backfilled.
4.02 General Requirements. — All soft and unstable material and other portions of the subgrade that will not compact readily or serve the intended purpose shall be removed and replaced by suitable material as directed. Sections of existing subgrade having a high clay content may require the admixture of sand from pits designated by the C. O. or from areas within the limits of the grading operations designated by the C. O.
Plaintiff says that paragraph 4.02 above indicates that it would be permitted to mix sand with material of high clay content encountered in the upper portions of the subgrade and that defendant’s order to exclude natural' ealico clay entirely, and artificial clay where it was more than 15 percent of the combination of soils encountered, was a revocation of this paragraph and a change in the specifications. Defendant insists that paragraph 4.02 has no bearing on the construction of the embankment which it urges is dealt with exclusively in Section III of the specifications, and that the term “sub-grade” does not refer to the embankment but is synonymous with the 2-inch plus sub-base course shown on the cross section drawing of the runway.
In order to evaluate these contentions, it is necessary to understand exactly what the plans and specifications called *254 for' in' the construction of the runways. The typical cross section of one of the runways contained in the plans and upon which plaintiff based its bid, provided for a' 6-inch base course.of a specified artificial mix to support the paved areas, with an additional 2-inch sub-base course of selected sand-clay material to act as an additional cushion under the paving and provide drainage for the water from beneath the 6-inch base course. The specifications also provided for a compacted “subgrade” to the full width of the paved areas in accordance with the specifications and in conformity with the lines, grades, and cross sections shown on the plans; the placing and compaction of the top of the embankment in the fill areas and the compaction of the “subgrade” in the cut areas. In Chapter XX of the Engineering Manual referred to and made a part of the specifications, “subgrade” is defined as follows: .
a. Subgrade. — The term “Subgrade” applies to the natural, soil in place, upon'which a “pavement” is constructed and in its general use'it defines the zone underlying-the “base course,” or underlying the “pavement” where a base course is not provided.
b. Compacted Subgrade. — This term applies to the upper-part of the subgrade which is compacted to a density greater than the portion of the subgrade below to increase the Subgrade bearing capacity. In the sense .used herein and. depicted on Inclosure No. 2, the term ’ “Compacted Subgrade” .applies only to the zone immediately underlying the base course or the “pavement” ■where a base course is not provided as distinct from-the remainder of the. subgrade.
In the'instant -case,.’the 2-inch plus sub-base course to be made'up'of selected materials encountered in the ordinary! excavation and grading -was to be paid for as unclassified' excavation at $0.26 per cubic yard, or as borrow at $0.28.' The artificial sand-clay-mix comprising the top 6 inches' of! the base’course was to be paid for as selected borrow within the limits of the reservation, or as sand from without' the’reservation át $0:50' per:ciibic yard; the mixing'process' was to be paid for at $0,06 per square yard.
The required' total'tliickness of base courses and pavement depends1 mostly'lipón’the-bearing ratio of the compacted *255 subgrade. If tbe natural soils at the site haye. a low-bearing ratio' when compacted, a properly designed pared .runway, will require a much thicker base course than where the compacted subgrade has a high bearing ratio. ■Where soils have-a low- bearing ratio, an increase in the wheel .load will require an appreciable increase in the thickness of the base course. The runways in the instant case were originally designed to accommodate a wheel load of 10,000 pounds. The evidence (Finding No. 27) and the Engineering Manual, both indicate that the soil in this part of Georgia and at the site,, when compacted, had a relatively low bearing ratio. .The. drawings and specifications provided for base courses and pavement of a combined thickness of approximately 9 inches. Assuming the original design to have been accurate, this would indicate that the bearing ratio of the compacted sub-. grade was between 7 and 8. To meet the requirements of Chapter XX of the Engineering Manual, which was used, as a guide in designing the runway, an increase in the wheel load from 10,000 pounds to 30,000 pounds, where the compacted subgrade has a bearing ratio of between 7 and 8, the combined thickness of base course and pavement would have to be practically doubled. Modification No. 2 which purported to make all the changes necessary by reason of the increased wheel load, called for changes only in the paved surface of the runway and did not provide .for any increase in the thickness of the underlying base courses. However, the witnesses for both parties concede that a thicker base course was required when the wheel load was so increased. (Finding No. 27), and the runways as finally built did in fact have, a sub-base course approximately 10 inches thicker than shown on the drawings.
Defendant contends that it did not order a change in the thickness of the base course; that it merely exercised its right to determine, the suitability of .material going into the embankment and that the fact that this procedure resulted in a 10-inch layer of select material exactly meeting the, requirements of the 2-inch sub-base course .was mere .coincidence. We cannot.believe that it was mere.coincidence that this run-, way was.constructed, exactly as it should have been,for .the type of subgrade soils present and' for the wheel load desig *256 nated. In ordering the exclusion of all material containing more than 15 percent calico clay in the top 10 inches of the subgrade as shown on the drawings, defendant was not merely determining the suitability of material for embankment, but was lowering the top elevation of the compacted subgrade 10 inches and was requiring the placing of a 12-inch sub-base course of select material. This 12-inch area was no longer either embankment'or subgrade, and neither Sections III ñor XV of the Specifications had any application to this area except that portion of Section III relating to the selection of materials for sub-base from materials encountered in ordinary excavation and grading. If defendant could stretch its right to determine suitability of embankment material to this extent, the plans and specifications relating to base courses become meaningless. What defendant ordered and got in the way of a base course was not only much better and stronger than the one called for by the plans, but was exactly what it should have ordered and secured to accommodate the heavier wheel load. Mr. E. F. Gunn, head of the grading and paving branch of the U. S. Engineer Office at Savannah, who supervised the preparation of the contract specifications, testified that the decision to exclude materials containing calico clay was decided upon after the contract was awarded and after the revised drawing proposing the increased wheel load had been prepared. Mr. Gunn testified that the exclusion of this material in the 12-inch area below the 6-inch base course was necessary to support the increased wheel load of 30,000 pounds which was being considered in August 1943. Mr. Gunn stated that he knew the revised construction would result in- increased cost to the contractor but he assumed that paragraph 3.05 (c) of the specifications providing for the use of “suitable” material in the embankment fill, made it unnecessary to specifically order as a change the construction of the additional 10-inch thickness in the sub-base course which was necessary to support the increased wheel load and that accordingly no such change was included in Modification 2. In our opinion this action constituted a change in the plans and specifications and a change order covering such work should have been issued *257 and an equitable adjustment made as required by Article 3 of the contract.[2] Consolidated Engineering Co., Inc. v. United States, 98 C. Cls. 256, 283, 284; Callahan Construction Co. v. United States, 91 C. Cls. 538, 632-635.
Plaintiff alleges that at the time it prepared its bid it had no information which would lead it to believe that the existing airfield would continue in operation during the performance of its contract to enlarge that field and contends Jthat the defendant’s continued operation of the field constituted an unknown condition “of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications * *
At the time plaintiff’s representatives visited the site of the work, the existing airfield was in operation as a school for training .pilots and .was actually in use on the day of the inspection. During the inspection trip defendant’s representatives did not tell plaintiff that the field would remain in operation, and the contract, plans, and specifications contained no hint that such would be the case (Finding No. 10). It was not until plaintiff was informed that it was the successful bidder and was in the process of negotiating with defendant’s representatives, that plaintiff was first advised that the existing field would be in full operation during the work under the contract. Upon being so informed, plaintiff’s president, Mr. MacDougald, protested that he had been completely ignorant of the fact that he would have to perform his work under those conditions and that his bid estimates had not been figured to perform the work under those circumstances. Plaintiff and Colonel Feringa, defendant’s district engineer, discussed the problem of resulting delays and additional costs and it was decided between them that plaintiff should proceed to execute the contract upon Feringa’s assurances which were embodied in the following “Memorandum to the Files” prepared by Colonel Feringa on July 27, 1943, the date of the award.
*258 Subject: MacDougald’s contract for construction of ■ runways, Moody Field, Valdosta, Georgia.
Memo to: Files.
Thru: Major Thomas.
I promised Mr. MacDougald that if a delay was occasioned due to operation of the field by the Air Corps every consideration to extension of time would be given due to such operations. I did not promise to give additional funds therefor because that would have to come in the nature of a claim substantiated by facts, and a ruling thereon made after the facts were in hand.
In the performance of the contract work, plaintiff found that its costs were increased through the necessity of moving its operations from place to place when wind changes caused defendant to use runways near those being constructed by plaintiff; by the necessity of removing its equipment at night from designated critical areas, parking it, lighting it, .and returning it to work areas in the morning. Plaintiff filed a claim at the conclusion of its contract, asking reimbursement for such additional costs plus a small amount to cover the expense of stationing flagmen to keep plaintiff’s equipment from entering certain zones when aircraft was taking off or landing. The detailed facts underlying this claim are contained in our Findings Nos. 28 and 29. The contracting officer denied this claim on May 1, 1944, and made formal findings of fact on July 17, 1944. Plaintiff took its appeal to the War Department Board of Contract Appeals and a hearing was held solely on the question of defendant’s liability, it being agreed that if plaintiff was held entitled to a recovery, the file would be returned to the Contracting Officer for a determination of the amount due, which determination would also be appealable to the Board.
' In passing upon plaintiff’s claim, the Board of Contract Appeals found that, although it was customary to specifically call the contractor’s attention to such conditions as the con-, tinued operation, of an airfield during the contract work period, plaintiff was not so advised; that the oral advice to. plaintiff that “whoever the successful bidder was, that they would have to cooperate with the Commanding Officer'of the Field,” did not' amount tó á warning that the field would continue in use during construction, but could logically be *259 construed- to refer merely to tlie obligation of every person on' a-military reservation to adhere generally to the instructions and regulations of the commanding officer. The Board further held that plaintiff was induced to proceed with the contract by the -assurances evidenced by the memorandum, and that plaintiff suffered losses while the Government reaped substantial advantages from the continued use of the airfield. It-was the Board’s opinion-that the only remedy open to plaintiff was by reformation of the contract for mutual mistake, and because the Board did not believe itself authorized to grant such relief, it recommended • that the matter be referred to-the Chief of Engineers for'consideration under the First War Powers Act and Executive Order No. 9001. In conclusion, the Board stated:
The Board has rendered several opinions denying relief where claims were made relative to additional expenses incurred by reason of alleged interference with contractors’ work by the operation of existing airfields upon which the work was being done. . Those opinions are not incongruous with the action here taken because each of. the contracts or specifications encountered in those opinions included some provision to the effect that the airfield would continue in operation and use, thus putting the contractor on notice that his work would have to be coordinated with the use of the airfield.
This Board returned the file to the Chief of Engineers for relief under the First War Powers Act, being of the opinion that a mistake had been made by the parties and that reformation of the contract was necessary, a type of relief outside the jurisdiction and power of the Board.
. It is not clear from the evidence whether the letter contract which was executed on July 27, 1943 was signed before of after.'tlie occurrence of the conversation concerning the anticipated operation of the airport and the preparation' of the 'memorandum by Colonel Feringa. The record before the War Department Board of Contract Appeals was equally, uncertain on this point.- There is no real conflict between the parties, they simply do not remember, Because of the nature of the conversations testified, to. and the tenor of the memorandum, we. believe that it is reasonable to conclude, and we have so found' (Finding Ü), that the conversations and the *260 preparation of the memorandum took place prior to the execution of the letter contract. The record establishes that the negotiating officer recognized that the contractor in making its bid had not contemplated the performance of the: con tract while the field was being operated as an active airfield and the negotiating officer know that the bid solicitation was silent on that point. The record also reveals that it was customary for such a condition to be specifically called to the attention of contractors, usually in the contract itself, and that at about the same time the contract in suit was being negotiated, plaintiff was performing a similar contract for the War Department which contained a specification providing as follows:
The attention of the contractor is invited to the fact that this field is presently in use as a training school for Army Air Force Pilots,- and’that this-work must be prosecuted with a minimum of interference to the using agencies. No equipment will be permitted to cross the portions of the field at any time without specific permission from the contracting officer in writing.
Under these circumstances, the conversations summarized in the memorandum gave assurances, that, the, time ,for completing the contract work would be extended if the use of the airfield by the military caused delays, and that any increased costs to the. contractor actually occasioned by such operations would be reimbursed. We believe that it was because of this understanding and these assurances that plaintiff executed the contract and proceeded with the work. Although this understanding was not incorporated in any of the formal contract documents* later prepared-and sent -to plaintiff, we think it was an inducement to the agreement and therefore a part of it. In this view of the case it is unnecés-sary to consider the various contentions of the parties with respect to the Government’s alleged liability under Article 4 of the contract and the Government’s defense that the continued operation of the field was a sovereign act.
Plaintiff claims that it lost $128,078.07 in its grading account, represented by contract items 3, 4, and 4a (Finding No. 36), because it was required to perform the contract while the adj acent airfield was in operation and because the Govern- *261 ruent required -the construction of a 12-inch, sub-base course instead of the 2-inch sub-base course specified for the paved areas. This sum represents the difference between plaintiff’s actual costs for those three items and the amounts paid by the Government.
Plaintiff’s claim that it is entitled to be reimbursed for all its losses on these items, assumes that its original cost estimates were correct. The evidence indicates, however, that plaintiff had underbid the work, including the items in question. Plaintiff’s bid was approximately $119,000 less than the composite bid of the 12 other bidders and the Government’s estimate applied to actual quantities performed (Finding No. 40). A reasonable allowance for profit in the other 12 bids would be approximately 10 percent over costs, and we assume that such bids included a 10 percent profit allowance. On the basis of the approximate cost of the composite bids and the Government’s estimate, it is reasonable to conclude that plaintiff’s loss attributable to its grading operations was $81,003.75. See Great Lakes Dredge and Dock Company v. United States, 119 C. Cls. 504, cert. den. March 10, 1952. We have reached this figure by deducting from plaintiff’s actual costs on its grading items the average of the Government’s estimate and the 12 other bids, after eliminating anticipated profits (Finding No. 42). We' have examined the record carefully to determine whether or not any portion of such excess costs were attributable to circumstances which would not entitle plaintiff to equitable adjustments under Article 3 of the contract and because of the continued operation of the airfield. We have found (Finding No. 43) that plain-, tiff’s costs were increased to some extent as a result of poor and unbalanced equipment, extremely dry weather during grading operations necessitating longer hauls of water for use in compacting and fine grading, and plaintiff’s method of advancing the construction of the base courses for paving before all grading had been completed so that cross hauling could not be done over such areas. We have found that a reasonable approximation of plaintiff’s increased costs of grading attributable to such circumstances was $12,150.56.
We have found that a reasonable approximation of plaintiff’s increased costs attributable to the Government’s opera *262 tion of the adjacent flying field during the contract performance period, was $20,250.94 (Finding No. 44), and that plaintiff’s increased costs attributable to change in the construction of the base courses, was $48,602.25 (Finding No. 45).
Plaintiff is entitled to recover $68,853.19.
It is so ordered.
MaddeN, Judge; Whitaker, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.

 The details of plaintiff’s claim to the Contracting Officer and Its appeal to the head of the department are contained in our Finding No. 83.