Carl G. ROLIN
v.
UNITED STATES.
No. 18-56.

United States Court of Claims.
April 2, 1958.

Solomon Dimond, Washington, D. C., Burton R. Thorman, Washington, D. C., on the brief, for plaintiff.

Thomas J. Lydon, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant.

PER CURIAM.

This suit was brought by plaintiff, a machinist and toolmaker, because he suffered an alleged financial loss in constructing an impedance measuring line and center conductor for the National Bureau of Standards under a contract with the defendant.

The case was referred under Rules 45 and 46, 28 U.S.C.A. to Mastin G. White, a trial commissioner of this court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner did so in a report filed October 29, 1957, followed by the filing of exceptions by plaintiff and the filing of briefs by both parties. Since the court agrees with the recommendations and findings of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis of its judgment in this case. Plaintiff is not entitled to recover and his petition will be dismissed.

It is so ordered.

Opinion of the Commissioner

In September 1948, while the plaintiff was visiting the Wright-Patterson Air Force Base in Dayton, Ohio, he learned from an Air Force employee that the National Bureau of Standards (which will usually be referred to in this opinion

as "the Bureau") was interested in obtaining an impedance measuring line. It happened that the plaintiff had previously been employed for some time as plant superintendent by the Inter-Ocean Engineering Company at Chicago, Illinois, and that, while so employed, he had supervised the construction of two horizontal impedance measuring lines which his employer had manufactured for the Air Force under contract. Upon learning that the Bureau wished to procure an impedance measuring line, the plaintiff addressed a letter to the Bureau on September 25, 1948, expressing the hope "that I may be favored with your order".

The plaintiff's informant had told him that the Bureau desired to attain in its impedance measuring line a higher degree of accuracy than had been achieved in the instruments procured by the Air Force. With respect to the factor of accuracy, the plaintiff stated as follows in his letter of September 25, 1948:

"As I supervised and actually worked on this project here in Chicago from its very inception, I do know the accuracy required in as far as mechanical dimensions are concerned. * * *

"On a job of this nature, it is very difficult to arrive at any closer dimension mechanically, but I do feel that the quality of material entering into the construction of this Line will and must give by far a closer reading near the Ideal than the last Line sent to Dayton.

"Structural improvements can be made to give the Line more rigidity than at present; also, other slight changes can be incorporated to give a better Line throughout."

After receiving the letter dated September 25, 1948 from the plaintiff, the Bureau arranged for the plaintiff to travel to Washington, D. C., for the purpose of conferring with and advising personnel of the Bureau concerning the mechanical specifications for the impedance measuring line that the Bureau desired to obtain. At this conference, which took place in November 1948, the Bureau personnel explained to the plaintiff the Bureau's basic requirements with respect to the line. Among these requirements were the matter of attaining a higher degree of accuracy than had previously been achieved in connection with the Air Force lines, and the substitution of a vertical arrangement for the horizontal arrangement that had been used in the construction of the Air Force lines.

Insofar as the base of the impedance measuring line was concerned, the only requirement expressed by the Bureau personnel during the conference with the plaintiff was that the base should be made of a non-magnetic metal. The conferees discussed the satisfactory results that had been obtained through the use of Ni-Resist metal as the base for each of the impedance measuring lines previously manufactured under the plaintiff's supervision for the Air Force; and it was jointly concluded by the Bureau personnel and the plaintiff that the specifications for the Bureau's impedance measuring line should call for the base to be made of Ni-Resist.

Ni-Resist is a proprietary metal alloy developed by the International Nickel Company. It was first put on the market in September 1928. There are five main types of Ni-Resist, two of them being magnetic and three non-magnetic in character. Ni-Resist is widely used in industry because of its relative stability in relation to other metals. However, as in the case of other metals, annealing or stress-relieving is necessary in order to achieve the required dimensional stability in a piece of Ni-Resist that is to be used in a situation where precision is important. Annealing is a process where the metal to be relieved of stresses is heated in a furnace. The proper time for annealing is after the piece of metal has been machined and ground to the prescribed dimensions.

Under the date of March 22, 1949, the Bureau issued to eight persons, including the plaintiff, an invitation requesting bids on the manufacture of an imped-

ance measuring line (item I), together with a center conductor (item II). The specifications for item I that were attached to the invitation provided (among other things) that:

"Bridge base shall be a casting of non-magnetic Ni-Resist metal."

The plaintiff submitted a bid covering the two items mentioned in the invitation for bids. He offered to perform the work on both items for a total consideration of $12,086. The plaintiff's bid was accepted on May 2, 1949; and on May 6, 1949, the plaintiff and defendant (acting through a contracting officer of the Bureau) signed a contract, which was numbered CST–10597.

The contract specifications relating to the impedance measuring line (item I) provided (among other things) that:

"Bridge base shall be a casting of non-magnetic Ni-Resist metal."

These specifications also provided in part as follows under the heading "General Mechanical Rigidity":

"Provision shall be made for removing any bow in the line that may occur when the line is suspended in a vertical position. If necessary, the contractor shall adjust the line at the NBS to a vertical position, within the tolerances given * * *, and shall remove all bowing from the line in order to meet the above specifications."

The plaintiff started working on the impedance measuring line and center conductor for the Bureau in the latter part of June or the early part of July 1949. The work was undertaken in rented shop facilities at Chicago.

In connection with the manufacture of the base for the impedance measuring line, the plaintiff first decided upon the type of Ni-Resist that would be best suited for such purpose, and then he obtained the Ni-Resist in powder form from the Steel Sales Corporation, which acted as the sales agent for the International Nickel Company in the Chicago area. The plaintiff next had a casting made of the Ni-Resist by the Elizabeth Foundry. The result appeared to be an excellent piece of metal. After the casting was obtained, the plaintiff followed the standard practice and "roughed it out". In order to do this, the plaintiff used a planer and removed the hard scale that had been formed on the piece of metal at the time when the casting was made at the foundry. Having completed this initial operation, the plaintiff had the casting annealed by the Lindberg Steel Treating Company, which was the biggest, and generally regarded as the best, among the companies in the Chicago area that were engaged in such work. After the annealing operation was performed, the plaintiff took the casting back to his shop and machined it down to within a few thousandths of an inch of the finished size, as indicated on the blueprint.

The Ni-Resist casting was then sent back to the Lindberg Steel Treating Company for another annealing operation. Although it was generally considered in 1949–1950 that a single annealing of Ni-Resist was sufficient to achieve the necessary dimensional stability, the the plaintiff decided upon a second annealing because of advice that he received from a sales engineer of the Steel Sales Corporation to the effect that a second heat treatment would provide "insurance" against subsequent movement of the metal.

After the casting had been annealed the second time, the plaintiff took it to the American Grinding & Machine Company for a final grinding in order to bring it down to the prescribed dimensions. The plaintiff warned the American Grinding & Machine Company that great precision was required. Accordingly, the casting was given special attention and care by the American Grinding & Machine Company. The plaintiff himself was on hand while the grinding was done, so that he might supervise the work and check the results.

When the various steps previously mentioned in connection with the Ni-Resist base had been taken, the plaintiff mounted the impedance measuring line

on the base. It was then discovered that the base contained a bow or warpage of from 8- to 12-thousandths of an inch along its entire length.

Upon discovering the bow in the Ni-Resist base, the plaintiff called on the Steel Sales Corporation for advice. A sales engineer from that company went to the plaintiff's shop and advised the plaintiff to have the Ni-Resist base annealed for the third time. That was done, the Lindberg Steel Treating Company doing the annealing.

The third annealing of the Ni-Resist base having been accomplished, the plaintiff again machined the base, and then took it to the American Grinding & Machine Company for another grinding operation. When that had been done, the impedance measuring line was once more mounted on the Ni-Resist base. It was discovered that the base again had a bow or warpage.

The plaintiff called upon the Lindberg Steel Treating Company for advice, and was advised to bring the Ni-Resist base back for a fourth annealing. The plaintiff did so. Subsequent to the fourth annealing, the plaintiff had the Ni-Resist base reground again by the American Grinding & Machine Company. Thereafter, the plaintiff again mounted the impedance measuring line on the Ni-Resist base, and it appeared that there was no bowing or warpage in the base.

In the latter part of May 1950, the plaintiff shipped the impedance measuring line and center conductor to the Bureau, which accepted them. The plaintiff then submitted to the Bureau a voucher dated May 26, 1950 for the contract price of $12,086. The voucher was paid on June 12, 1950.

The plaintiff would have been able to complete and deliver the impedance measuring line and center conductor to the Bureau by the middle of January 1950 but for the bowing or warpage in the Ni-Resist base. Hence, the delay until the latter part of May 1950 in completing performance under the contract was caused by the bowing or warpage in the base and the extensive curative operations that were required in order to eliminate such condition.

In a letter dated June 5, 1950 to the Bureau, the plaintiff referred to "the unexpected trouble encountered by us due to warpage of the Ni-Resist base", and asserted that "the stipulated contract price * * * is not sufficient to defray labor, engineering material and shop rental and has placed me in a precarious financial position". The plaintiff further stated that "I appeal to your sense of justice in asking for an additional payment that will allow me to break even", and indicated that "In a few days you will receive a statement showing all my expenses in this matter".

The statement of expenses mentioned in the preceding paragraph was submitted by the plaintiff to the Bureau under the date of June 20, 1950. This statement showed the "Actual expenditures in the designing and building of One Meter Impedance Measuring Line as per Contract No. CST–10597" to have been $16,370.35. The plaintiff added to this figure the amount of $1,637.03 representing an expected profit of 10 percent, and thus arrived at a total figure of $18,007.38. From this total, the plaintiff deducted the contract price of $12,086, which he had already received, leaving a remainder of $5,921.38.

Under the date of August 18, 1950, the plaintiff submitted to the Bureau a voucher in the amount of $4,284.35, representing a claim for additional compensation under contract CST–10597. In submitting this claim, the plaintiff eliminated from the statement mentioned in the preceding paragraph the item of $1,637.03 relating to expected profit.

The Bureau did not act on the plaintiff's claim for additional compensation, but referred it to the General Accounting Office. The plaintiff's claim was disallowed by the General Accounting Office.

The present litigation followed.

The evidence does not show why the bowing or warpage occurred in the Ni-Resist base that is involved in this case.

All the operations in connection with the preparation and processing of the base were performed with great care and skill. Although the base should not have been machined or ground after having been annealed, the evidence does not warrant an inference that the failure to follow the proper practice in this respect caused the bowing or warpage of the base.

Instances of inexplicable instability among pieces of metal are sometimes encountered. It appears, in the light of all the evidence, that the bowing or warpage of the Ni-Resist base involved in the present litigation was such an instance.

■ In its role as a party to a business contract, the United States is subject to the same liability—and is not subject to any greater liability—than any other person would be under similar circumstances. Deming v. United States, 1865, 1 Ct.Cl. 190, 191, appeal dismissed 9 Wall. 145, 19 L.Ed. 772. Therefore, the fact that a person who has contracted with the Government to furnish materials or services encounters unforeseen difficulties, and thereby incurs unexpected expenses, in the performance of the contract does not impose upon the Government any legal obligation to relieve its contractor of the unexpected financial burden. Columbus Ry. Power & Light Co. v. City of Columbus, 1919, 249 U.S. 399, 412, 39 S.Ct. 349, 63 L.Ed. 669; Industrial Engineering Co., Inc., v. United States, 1940, 92 Ct.Cl. 54, 60. As the Supreme Court stated in United States v. Spearin, 1918, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166:

" * * * Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not * * * become entitled to additional compensation, because unforeseen difficulties are encountered."

■ Therefore, the Government's financial obligation to anyone who has furnished materials or services to the Government under a contract is to be found "within the four walls of the contract" (Steel Products Engineering Co. v. United States, 1933, 78 Ct.Cl. 410, 419), unless the Government has caused its contractor to incur unforeseen expenses in performing the contract (MacDougald Construction Co. v. United States, 1952, 122 Ct.Cl. 210, 261–262).

■ In the present case, no act or omission upon the part of the Government caused the unforeseen difficulty which the plaintiff encountered, and the unexpected expenses which the plaintiff incurred, when the Ni-Resist base that he had obtained for the impedance measuring line developed a bow or warpage on two separate occasions.

The Government did not prescribe the manner in which the Ni-Resist base should be prepared or treated in order to meet the requirements set out in the contract specifications. Consequently, the responsibility rested on the plaintiff to meet the requirements of the specifications by the use of such methods as he might deem to be appropriate for that purpose. John Thomson Press & Mfg. Co. v. United States, 1922, 57 Ct.Cl. 200, 209.

In the final analysis, the plaintiff only did what he had agreed to do under the contract—i. e., he produced an impedance measuring line and center conductor that complied with the specifications. Conversely, the defendant only received what it was entitled to receive under the contract—i. e., an impedance measuring line and center conductor that complied with the specifications. The defendant paid and the plaintiff received the full amount that they had agreed upon as the plaintiff's compensation for producing and delivering the line and conductor to the defendant. Therefore, both parties have done everything that they promised to do, and only what they promised to do, when they entered into the contract.

The case arises because the plaintiff lost money on the contract due to the fact that he encountered extraordinary difficulty in achieving the necessary dimensional stability in the particular piece of Ni-Resist metal that he used as the base of the impedance measuring line.

[redacted]

However, since the defendant was not responsible in any way for the difficulty that the plaintiff encountered in performing the contract, the defendant is not liable for the amount of the plaintiff's financial loss.

Of course, it can be assumed that if the plaintiff, at the time when he submitted his bid, had foreseen the trouble that he would have with the particular piece of Ni-Resist, he would not have offered to do the work outlined in the invitation for $12,086. However, this court cannot act on the basis of what it believes the plaintiff would have done, or would not have done, if he had been gifted with prophetic forsight. This court can only act upon the basis of what the plaintiff and the defendant actually did in the light of the information available to them at the time when the plaintiff's bid was submitted and accepted. Russell v. Shell Petroleum Corporation, 10 Cir., 1933, 66 F.2d 864, 867.

The plaintiff relies upon the decision of this court in the case of R. M. Hollingshead Corporation v. United States, 1953, 111 F.Supp. 285, 124 Ct.Cl. 681. In that case, Hollingshead and the Government entered into a contract which called upon the former to supply the Government with 108,000 gallons of 25-percent DDT concentrate in five-gallon metal drums. The contract required that the concentrate should be "a clear, stable liquid which will not become cloudy or otherwise deteriorate upon standing for a period of one year * * *". After 22,815 gallons of the concentrate had been delivered, it was found that the liquid lost its clear color upon being stored for a period of time. When the contract was made, DDT concentrate was a relatively new product, and neither Hollingshead nor the Government knew that it was impossible to store the concentrate in metal containers without a resulting loss of its clear color. Hollingshead sued for the contract price of the concentrate that had been furnished to the Government under the contract.

This court held in favor of Hollingshead. The court stated (111 F.Supp. at page 286, 124 Ct.Cl. at pages 683–684) that the parties, because of a mutual mistake concerning a material fact, had entered into a contract which was impossible of performance, and that there was no justification for throwing upon Hollingshead a loss which was a direct result of faulty specifications promulgated by the Government.

The case of R. M. Hollingshead Corporation v. United States, supra, is readily distinguishable from the present case. In the first place, the specifications promulgated by the Government in the present case were not faulty and they did not impose upon the plaintiff a task that was impossible to perform. This is shown by the fact that the plaintiff actually did perform his task under the contract in a manner that was acceptable to the defendant, although, because of the extraordinary instability of the particular piece of Ni-Resist metal involved in the case, the performance required a longer period of time and a greater expenditure of effort and money than he had anticipated at the time when the plaintiff entered into the contract. In the second place, whereas the earlier case was a suit for the price that the Government had agreed to pay its contractor, the Government in the present case has already paid the plaintiff the full amount of the contract price and the present suit is for an additional sum of money over and above that which the parties agreed upon in the contract as the amount of the plaintiff's compensation.

Although one's sympathies are naturally aroused by the plaintiff's unfortunate experience in performing contract No. CST–10597, there does not appear to be any legal relief that can properly be granted to him by this court.

For the reasons outlined above, it is my opinion that the plaintiff is not entitled to recover, and that the petition should be dismissed.