Per Curiam :
This case was referred to Trial Commissioner Richard Arens with directions to make recommendation for conclusions of law on plaintiff’s motion and defendant’s cross-motion for summary judgment. The commissioner has done so in an opinion and report filed on December 20,1965. Plaintiff filed a request for review, defendant filed a request for partial review and the case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is entitled to recover on Claim 4 and its motion for summary judgment is granted to that extent, but further proceedings in this case are suspended in order that plaintiff may present that claim to the Armed Services Board of Contract Appeals for its determination of the amount due plaintiff thereon.
With respect to Claims 1, 2, and 3 of plaintiff’s petition, plaintiff’s motion for summary judgment is denied, defendant’s cross-motion is granted, and the petition is dismissed as to those claims.
Commissioner Arens’ opinion*, as modified by the court, is as follows:
Plaintiff, an experienced manufacturer of molded-cable assemblies, was, in March 1959, awarded a fixed-price-supply contract by the U.S. Navy for the manufacture of four types of underwater-mine cables. The assembly of each cable consisted of the wiring of electronic parts of standard manuf ac- *1291 ture into a harness which was then enclosed within an envelope of a rubber-like plastic-molding material. The cable assembly was then baked in a metal mold. Final electrical testing of completed cables after the baking revealed the failure of large numbers of cables that had passed such tests prior to baking. After considerable difficulty and expense (the cause of which is the basis of the present controversy), plaintiff ultimately successfully performed the contract. Briefly and generally stated, plaintiff contends that the components as well as the molding process were specified by defendant in the contract and that they were the cause of the trouble. Defendant, on the other hand, asserts in essence that the molding process was not specified in the contract and that the molding process was plaintiff’s responsibility and was the cause of the trouble.
Among the items which plaintiff purchased, and which were specified in the contract by the manufacturer’s name “or equal,” were Jones sockets, Amphenol P-41 connectors, Buggie connectors, and Armstrong potting compound. Each of these four items was involved in a separate claim for an equitable adjustment which plaintiff made to the contracting officer who denied three of the claims and allowed on the fourth claim an equitable adjustment concerning which plaintiff took issue on quantum.
Following plaintiff’s timely appeal under the standard disputes clause of the contract, the Armed Services Board of Contract Appeals, after conducting a hearing, on August 2, 1962, denied three claims and returned the fourth claim on the issue of quantum to the parties for a further effort at an equitable settlement in conformity with certain guidelines.[1] Thereafter, upon petition of plaintiff and without objection of the Government, the Board released jurisdiction in order that plaintiff could “prosecute the entire matter” in this court.
The case is before the court on cross-motions for summary judgment. Plaintiff’s position is that the Board committed errors in its conclusions of law and fact, that the Board committed procedural errors, and that plaintiff’s method of computing its extra costs on its claim on the issue of quantum *1292 should be accepted by the court. Plaintiff’s position will be detailed in connection with consideration of the separate claims.
Claim, 1 — The Jones Socket
One of the components specified for use with one type of cable assembly and certified for producibility was an electrical plug, the Jones socket, which had S3 female contacts. The contract drawings noted the Jones socket could be either type MFE or type MFH. Type MFE had better electrical conduction properties but type MFIT was more heat resistant. Plaintiff ordered type MFE because plaintiff deemed electrical properties to be more important than heat-resisting properties. Although electrical tests on the Jones sockets conducted prior to molding were satisfactory, after the molding process commenced in September 1959, it was discovered that the sockets became distorted so that they would not mate with the male counterparts. Plaintiff notified the Navy of these facts and requested its assistance in finding a solution to the problem.
During the period from September 1959 to June 1960, Mr. Eugene Hiller, an engineer hired by plaintiff as a consultant on the contract, suggested, and plaintiff attempted several solutions to the problem, such as varying the molding temperature, molding the socket with the male and female portions already mated, and leaving air space within the mold, but none of the solutions suggested by Mr. Hiller worked. In July 1960, plaintiff advised defendant that rejects of the cable in which the Jones socket was used wei'e running over 90 percent and that production was being stopped. Thereafter, the Navy advised plaintiff that U.S. Plastic Molding Co., which had a contract to produce .underwater-mine cables under the same specifications as those involved in plaintiff’s contract, used a prebaking technique in hardening Jones sockets, and suggested that plaintiff prebake the sockets with the mating plugs in position. Plaintiff tried this technique, but it proved unsuccessful since a high percentage of the pre-baked plugs cracked.
In August 1960, plaintiff devised a solution to the problem by inserting a coil adjacent to the Jones socket in the mold. When water was run through the coil, the surface of the *1293 socket was cooled and the distortion prevented. Plaintiff thereafter successfully produced the cable assemblies including the Jones sockets.
On December 15, 1960, the contracting officer sent a letter to plaintiff reading in part:
Part II — Jones Plug — It has been determined that it was impossible to use, on a production basis, the plugs purchased to drawing specifications, which were incapable of assembly on the cable without additional process requirements. A change order is in process of being formulated to correct this condition.
On December 27, 1960, Change Order No. 22 was issued, which deleted the low-heat resistant Jones socket (type MFE), and provided that:
As an alternate to be [sic] above, the contractor is permitted to use the material now specified on the drawing and to institute a water-cooling method for the purpose of reducing the temperature of the face of the Jones plug below the distortion point.
The change order carried no price adjustment, and plaintiff’s subsequent claim for an equitable adjustment was, on August 22, 1961, disallowed by the contracting officer who wrote that the change order revised the drawing:
* * * to provide for plastic material which would withstand the excessive temperature and pressure present in your molding process, and allowed, as an alternate, the method being used by your company which consisted of water cooling the mold. The actual change in the drawing is not being adhered to by your company, but the alternate method specified is being used. This alternate was inserted for your convenience, to accommodate your manufacturing process, and to preclude the necessity of ordering new plugs. It is, therefore, the decision of the Contracting Officer that Modification 22 did not cause your company to incur additional costs which should be compensated for as an adjustment to the contract price.
Plaintiff appealed the contracting officer’s decision to the Armed Services Board of Contract Appeals which, in denying the claim, found that the Jones socket was capable of withstanding the 350° F. temperature which was the maximum temperature prescribed in the contract documents for *1294 the baking process, without cracking, chipping, shrinking, changing dimension or distortion; that the only other physical force to which the Jones socket distortion was attributed was pressure, but that the contract did not prescribe any molding pressure; and that the contract did not specify the tooling, mold design or manufacturing technique which were plaintiff’s responsibility.
From a study of the entire record in the case, it is concluded that the Board’s foregoing interpretation of the contract documents is correct and that its findings relating to the Jones socket are supported by substantial evidence and, therefore, cannot be disturbed. River Construction Corp. v. United States, 159 Ct. Cl. 254 (1962).
Although the contract documents specified the Jones socket and certified it for producibility, there was no minimum but only a maximum temperature (350° F.) specified to which the cable assembly was to be subjected in the molding process; in other words, the cable assembly was not to be subjected to a temperature in excess of 350° F. This clearly did not constitute a direction that the electrical components had to be subjected to this maximum temperature in order to complete the molding process successfully. Witnesses before the Board differed in their testimony regarding the causes of the distortion of the Jones sockets, i.e., whether due to heat, pressure or a combination of both; but, there was substantial evidence to support the conclusion of the Board that the Jones socket could nevertheless withstand the maximum heat specified in the molding process without harmful effects.[2] Plaintiff’s major premise is that the contract documents prescribed the molding process which plaintiff attempted unsuccessfully to use. To this end, plaintiff points to Navy Ordnance Document No. OS 8001 B, entitled “Descriptions and Requirements, Polyvinyl Chloride Plastisol.” One section of the NAVORD, entitled “Fusing technique for test specimens” sets forth a “suggested method” for fusing test specimens of the plastisol, but the suggested method was *1295 obviously for testing a specimen solid lump of plastisol and not a suggested method for molding in plastisol various electronic devices such as the Jones socket. The evidence supports the conclusion that the various factors (heat, pressure, time in the mold, etc.) would not be the same for molding in plastisol various electronic devices as they would be for fusing a solid lump of plastisol.
The ambiguous statement contained in the letter dated December 15, 1960, from the contracting officer that “it was impossible to use on a production basis, the plugs purchased to drawing specifications, which were incapable of assembly on the cable without additional process requirements,” cannot be deemed an admission that the Government prescribed the molding process, but, taken in connection with the entire record, was merely a reflection of the representations made by plaintiff that its then molding process was incompatible with the Jones socket. The contracting officer’s letter of August 22, 1961, states that the change order which he had issued on December 27, 1960, “was inserted for your [plaintiff’s] convenience, to accommodate your [plaintiff’s] manufacturing process, and to preclude the necessity of ordering new plugs.”
The cases which plaintiff cites in connection with its major premise (that the contract documents prescribed the molding process) are inapposite because the facts in those cases reveal situations in which the contracts did prescribe manufacturing processes, while in the instant case there was no such prescription and no corresponding liability on the Government for the difficulties encountered. See Rolin v. United States, 142 Ct. Cl. 73, 160 F. Supp. 264 (1958).
Plaintiff argues alternately that the contract contemplated “normal production methods” and that the contract was impossible to perform with such methods. The Board found, however, and the evidence supports its finding, that insertion of the water-cooled coil in the mold was “a simple mechanical or tooling device” which was a practical expedient. Finally, plaintiff argues that, under the principles announced in Helene Curtis Industries, Inc. v. United States, 160 Ct. Cl. 437, 312 F. 2d 774 (1963), the Government wrongfully with *1296 held from plaintiff vital information concerning manufacturing processes and, hence, breached the contract. There is no evidence in the record, however, that at the time plaintiff entered into its contract the Government was aware of the precise nature of the difficulty which U.S. Plastic Molding Co. was experiencing or had experienced and, moreover, after the Government did transmit to plaintiff the essence of the prebaking technique which U.S. Plastic Molding Co. used, plaintiff was unsuccessful with the technique. The device which plaintiff ultimately employed successfully in its molding process was entirely different from the device employed by U.S. Plastic Molding Co. successfully in its molding process.
Plaintiff contends that the Armed Services Board of Contract Appeals committed procedural errors “by permitting and inducing” the testimony of J. L. Raesler relating to plaintiff’s performance of the contract, and by refusing to require the Government to produce evidence of U.S. Plastic’s contract with the Navy. Mr. Raesler testified before the Board as defendant’s expert who possessed vast experience in molding plastics. He testified concerning the experience of U.S. Plastic Molding Co., of which he was general manager, in the molding of cable assemblies under the same specifications which were involved in plaintiff’s contract, and having been present at the hearing during the presentation of plaintiff’s testimony, expressed his opinion on the nature of the problems which plaintiff encountered. A review of the transcript of the proceedings does not reveal an improper exercise of discretion by the Board in admitting the testimony of Mr. Raesler and it does not appear that the questioning, by the Board member present, of Mr. Raesler constituted a denial of any right of plaintiff. While Mr. Raesler was describing the process which his company used in molding the cable assemblies, plaintiff’s counsel announced that he was calling upon the Government to produce all of the files that the Government had with U.S. Plastic Molding Co. The Board member present stated:
Let’s see what his testimony is like. I say right now the Court is prone to rule against any such request as *1297 that. I don’t propose to try three other contracts. We are having enough trouble trying this one.
The record does not reflect either that the Board member committed error in not then ordering the Government to produce all of the files that the Government had with U.S. Plastic Molding Co., or that plaintiff’s counsel thereafter renewed his request for the files.
Plaintiff’s first claim must accordingly be denied.
Claim 2 — The Armstrong Potting Compound
The contract required that before molding, the electrical connections in the cables were to be potted with an epoxy compound manufactured by the Armstrong Products Co., “or equal,” and the contract represented that such compound was certified for producibility. Plaintiff potted the electrical connections with the specified Armstrong potting compound and, although electrical tests after potting and before molding were successful, after the molding it was found that the compound had moved or pulled away from the terminals and had, thus, adversely affected the circuits. When plaintiff reported this to the Navy, the Navy suggested the use of a greater quantity of the potting compound, but this did not solve the problem. Mr. Eugene Hiller, who, as heretofore noted, was an engineer hired by plaintiff as a consultant on the contract, concluded after dissecting the cable assemblies that the combination of the heat (320° F.-3500 F.) and the pressure used in the molding process (3,000-5,000 p.s.i.) caused the compound to soften and pull away from the terminals. Mr. Hiller’s conclusion was confirmed when he thereafter obtained a brochure of instructions on the use and properties of the Armstrong potting compound. This brochure stated that at room temperature the compound could withstand a shear block stress of 3,000 to 5,000 p.s.i., which deteriorates to 50 percent of that value at 200° F. and more rapidly at higher temperatures.
Thereafter, plaintiff procured and tested successfully the Hysol potting compound which the contracting officer orally authorized plaintiff to use instead of the Armstrong com *1298 pound; but, when requested to issue a change order, the contracting officer, on December 15, 1960, wrote:
The material specifications 12-2-30000-34 and 12-2-300002-1 both state Armstrong or equal. The choice of an alternate material is a company prerogative within the scope of the contract and the drawing specifications. Hysol and Stycast are equal or better products and may be used without request for waiver. No change order is necessary and none will be issued.
There was testimony before the Board (by Mr. Raesler, general manager of U.S. Plastic Molding Co.) that by using a low pressure mold the U.S. Plastic Molding Co. experienced no difficulty with the Armstrong potting compound in its manufacture of cable assemblies identical to those manufactured by plaintiff and that plaintiff’s difficulty with the Armstrong potting compound could have been caused by its molding process in which it packed the molding material with spaces or voids behind the Jones socket, and thus permitted hydraulic-pressure movements against the potting compound.
In its ultimate conclusion, the Board (apparently erroneously) stated that “plaintiff precipitated the potting problem by its violation of specifications in the first instance.” The Board nevertheless found, and there is substantial evidence to support the finding, that plaintiff’s difficulty with the Armstrong potting compound was caused by its molding techniques.
Plaintiff makes the same arguments with regard to the Armstrong potting compound claim that it makes with reference to the Jones socket claim, namely, that the contract documents prescribed the molding process, that the contract contemplated “normal production methods” and was impossible to perform with such methods, and that the Government wrongfully withheld from plaintiff vital information concerning manufacturing processes; but, for the reasons previously assigned in connection with the consideration of the Jones socket claim, these arguments are without merit. There is no showing that the U.S. Plastic Molding Co. experienced any difficulty with the Armstrong potting com *1299 pound or that tbe Government withheld from plaintiff any information concerning the compound which the Government knew a contractor would require but which would not be available to it. In fact, the suggestion which the Navy made to plaintiff (that it use a greater quantity of the compound) did not solve the problem.
Plaintiff’s second claim must accordingly be denied.
Qlaim 3■ — The Bv,ggie Connector
One of the components specified for use with one type of cable assembly and certified for producibility was a connector receptacle, manufactured by the H. H. Buggie Co., “or equal,” which consisted of male and female parts held together by a brass ring. The specifications also provided:
Connector Eeceptacle shall be sealed to prevent entrance of moisture between mating surfaces with dielectric sealer per MIL-S-8516, Cure B.
The Buggie connector, as delivered to plaintiff from the manufacturer, came with the sealer already deposited between the mating surfaces and beneath the brass ring. During the molding process, the plastisol was forced under the brass ring and between the mating surfaces where it fouled the plug. The Navy suggested that plaintiff coat the brass ring with an outside sealant as a means of preventing the seepage of the plastisol. This proved successful and plaintiff requested a contract modification to cover the use of this procedure. On December 15,1960, the contracting officer replied to plaintiff’s request, and allowed plaintiff to coat the brass ring, but refused to issue a change order. There was testimony before the Board that the heat of the molding process caused the sealer which had been deposited by the manufacturer between the mating surfaces to evaporate and that the heat and pressure in the molding process forced the plastisol under the brass ring. The Board ruled that the above-quoted specifications required an outside sealer and that the specifications were not merely descriptive of the sealer with which the connector came from the manufacturer. This interpretation by the Board of the specifications is, of *1300 course, a matter of law concerning which, this court makes its independent determination. River Construction Corp. v. United States, supra.
The contract drawings in evidence show only the female portion of the connector, without the sealer, which apparently the specifications direct the manufacturers to use before mating the female portion with the male portion of the connector. It is concluded from an examination of the specifications in connection with the contract drawings that the specifications are at least ambiguous and that plaintiff’s interpretation was, under the rule stated in WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 323 F. 2d 874 (1963), reasonable. But this conclusion does not mean that plaintiff can prevail on this claim because it is clear from the record that it was plaintiff’s molding process which created the necessity for the outside sealer. Plaintiff’s vice president testified at the Board hearing that the Buggie connector was not defective and that the plastisol was forced under the brass ring and between the mating surfaces by the “heat and pressure from the molding.” The board found that the fouling of the plug and rejection of the cable was caused by “the great pressures generated by appellant’s [plaintiff’s] molding procedures.” Since it has already been concluded that the contract did not prescribe the molding pressures or the molding technique, and specified only a maximum temperature to which the assembly was to be subjected, it follows that the application of the outside sealer was a measure utilized by plaintiff to adapt the Buggie connector to its molding procedures and, hence, plaintiff’s third claim must be denied. Rolin v. United States, supra.
. Claim Is- — The P-Jpl Connector
One of the components specified for use with one type of cable assembly and certified for producibility was the P-41 connector, “or equal,” the drawings for which depict a connector plug with a movable electrical terminal recessed within an open end and a note reading:
Molding material not to extend beyond this point in order to insure proper functioning of connector.
*1301 It was discovered that during the molding, plastisol flowed into the open end of the P-4-1 connector and fouled it. Various devices were attempted to prevent the fouling of the connector, but were to no avail. Among these was a brass plug similar to one devised by U.S. Plastic Molding Co. for which the Navy issued a mandatory change order. Finally, plaintiff solved the problem by use of a spauldite plug with a shoulder. After some delay, the Navy granted plaintiff permission to use the spauldite plug, but without any change in contract cost; but, subsequently, by change order, allowed plaintiff an equitable adjustment of $411.13, for additional costs as a result of the change. Plaintiff appealed the decision to the Board on the issue of quantum. In its presentation to the Board, plaintiff used the total-cost approach from which it derived the figure of $88,298.92 on the P-41 connector claim. The Board found that plaintiff’s accounting procedures were inapplicable and therefore returned the matter to the parties for a further effort at an equitable settlement in conformity with certain guidelines. The Board retained jurisdiction, but with the condition that, unless the parties notified the Board of settlement by negotiation within 30 days, the appeal would be set for further hearing on the issue of quantum. Thereafter, plaintiff declined to respond to the written request by the Government to enter into negotiations for settlement, but petitioned the Board for release of jurisdiction on the grounds that it desired to prosecute the entire matter in this court. The Government did not object and the Board released jurisdiction.
At that time the law was in an unsettled state, and the parties could not know that WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 323 F. 2d 874 (1963) and Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 861 (1963), insofar as they held that the court would determine the amount of damages for itself, would be disapproved by the Supreme Court in United States v. Anthony Grace & Sons, Inc., 384 U.S. 424 (1966). As a result of the Supreme Court’s decision in that case and in United States v. Utah Constr. and Mining Co., 384 U.S. 394 (1966), it may now be necessary to return other pending cases to the administrative *1302 boards for a determination of the amount of damages due the contractor. Under these circumstances it would frustrate the ends of justice to dismiss a claim which the ASBCA has found to be meritorious. Therefore, we hold that plaintiff is entitled to recover on Claim 4 of the petition, but further proceedings in this case are suspended in order that the claim may be returned to the ASBCA for its determination of the amount due plaintiff thereon.
With respect to Claims 1, 2, and 3 of plaintiff’s petition, plaintiff’s motion for summary judgment is denied, defendant’s cross-motion for summary judgment is granted, and the petition is dismissed as to those claims.

The opinion and recommended conclusion of law are submitted pursuant to order of the court under Rule 54(b). The facts are stated in the opinion.

 ASBCA No. 7415.

 The Board found, for instance, that a sample Jones plug was baked by the contractor for a cycle of seven times at 350i° E\ and still passed all required tests with no apparent change in visual or electrical characteristics.